UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TRISHA HINOJOSA, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 13 CV 9079 |
| v. | ) | |
| | ) | Honorable Judge Joan H. Lefkow |
| SHERIFF OF COOK COUNTY, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

### **DEFENDANTS' LOCAL RULE 56.1(a) STATEMENT OF FACTS**

NOW COME Defendants, Sheriff Thomas Dart, Cook County and Officer Gary Contreras, by and through their attorney, Anita Alvarez, State's Attorney of Cook County, and her Assistant State's Attorney, Michael L. Gallagher, and hereby submit pursuant to Local Court Rule 56.1(a), their statement of facts in support of Defendants' Motion for Summary Judgment. In support thereof, Defendants state the following:

### **Plaintiff's History with CCSPD**

1. On April 24, 2008, Cook County Sheriff's Police Department ("CCSPD") officers responded to a Cook County Dispatch advisory of a "check for wellbeing" at Plaintiff Arturos apartment located at 3221 W. Parkway Drive, Northbrook, Illinois. (Exhibit 1, Cook County Sheriff's Police Department Reports, pg.1). CCSP Officers Fullman and Johnson along with Sgt. Collins attempted to gain entry repeatedly, and were eventually let in by the building maintenance person. (Exh. 1, CCSPD Rpt. pg.1-2).

2. Plaintiff had informed his friend, Troy Smith, that he was "going to harm" himself. (Exh. 1, CCSPD Rpt. pg. 2).

3. Upon entry, officers discovered Plaintiff lying on his couch and several notes were found nearby indicating that Plaintiff intended to harm himself. (Exh. 1, CCSPD Rpt. pg. 2-

1

3, 8-15).

4. Plaintiff was transported via ambulance to the hospital where he was involuntarily admitted for care. (Exh. 1, CCSPD Rpt. pg.2).

5. On January 4, 2009, CCSPD officers once again responded to Plaintiff's Northfield residence because he was suicidal and "wanted to drink himself to death." (Exh. 1, CCSPD Rpt. pg.16).

6. Upon arrival, Plaintiff's girlfriend at the time (later identified as Trisha Hinojosa wife of the deceased) informed police that Plaintiff had "been drinking for the past two and a half weeks and that he had a friend who drank himself to death and that is what he was going to do." (Exh. 1, CCSPD Rpt. pg.16).

7. Glenview Fire responded to the scene and transported Plaintiff to Glenbrook Hospital ER for treatment. (Exh. 1, CCSPD Rpt. pg.16-17).

## 911 Call and Radio Dispatch

8. On January 24, 2010, at approximately 4:00 p.m., CCSPD 911 Dispatch received a domestic disturbance call from Plaintiff's apartment complex located at 3221 W. Parkway Drive, Northbrook, Illinois. (Exhibit 2, CCSPD Dispatch call log at pg.1; Exhibit 3 CCSPD Dispatch audio diskette "track" 1).

9. The girl (later identified as Eve Kolgovaite, DOB 06/11/70, daughter of deceased) was upset, crying, and stated "can you come out here please" before abruptly hanging up the phone. (Exh. 3, CCSPD Dispatch audio diskette "track" 1; Exh. 4, CCSPD Dispatch transcript Vol. 1 pg. 2:4). When the dispatcher attempted to call back, there was no answer. (ISP Investigative Summary, 0021; Exh. 3 CCSPD Dispatch audio diskette "track" 2 at 01:20; Exh. 4, CCSPD Dispatch transcript Vol. 1 pg.2:1-19).

10. At approximately 4:00 p.m., the CCSPD 911 Dispatcher made a department-wide radio call for a "wellbeing" check and stated the following:

"Previous incident was for suicidal male subject. It was Eve's father." "There was a caution in the previous CR indicating that he will fight police." (Exh. 3 CCSPD Dispatch audio diskette "track" 1, track 3 at 01:38-02:50; Exh. 4 CCSPD Dispatch transcript Vol. 1 pg.4:9-13, 5:3-19; Exhibit 7, CCSPD Officer Macugowski Dep. pg.44:17-24,45:1-18).

11. Eve later told Illinois State Police ("ISP") investigators that for the past six months Plaintiff had been going on "drinking binges" and have become violent. (Exh. 5, ISP Investigative Summary at pg.0021; Exh. 7, Off. Macugowski Dep. pg.69:4-21).

12. When Plaintiff went on drinking binges, his wife Trisha Hinojosa, did not allow him to live with her, which is why Plaintiff was staying at 3221 Parkway Blvd. at the time of the incident. (Exh. 5, ISP Investigative Summary at pg. 0032).

13. On the night of the incident, Plaintiff was drunk and yelling at Eve that he wanted her to get him more alcohol. (Exh. 6, CCSPD Officer Prohaska Dep. pg.12:18-20; Exh. 7, Off. Macugowski Dep. pg.69:4-21). Eve refused and Plaintiff began screaming and acting irrational. (Exh. 6, Prohaska Dep. pg.12:20-22).

14. When Eve refused, Plaintiff threw full beer cans at her and struck her in the back. (Exh. 5, ISP Investigative Summary at pg.0021, 0032; Exh. 7, Off. Macugowski Dep. pg.69:4-21). Eve ran from the living room and locked herself inside the bedroom while she called 911. (Exh. 5, ISP Investigative Summary pg. 32).

15. At that time, Plaintiff began punching and kicking at the bedroom door. *Id.*; Exhibit 13, ISP Scene photographs disk 2, IMG_300-310_JPG). Plaintiff then forcefully opened the bedroom door and threw more beer cans at Eve before yelling "it's time for you to let me

go." (Exh. 5, ISP Investigative Summary pg.0021, 0032; Exhibit 13, ISP Scene photographs disk 2, IMG_300-310, 328-331_JPG).).

16. Eve believed that her father was "really going to hurt [her]", so she ran back to the living room and then downstairs and out of the condo building. *Id.* at 0021. As she ran outside, she was greeted by CCSPD officers. *Id.* at 0021.

### CCSPD Initial Encounter with Plaintiff

17. CCSPD Officers Ronald Prohaska and Henry Macugowski were the first officers to respond to the scene. (Exh. 6, Off. Prohaska Dep. pg.7:12-23, Exh. 7, Off. Macugowski Dep. pg.15-16).

18. Upon arrival, the Officers observed Eve standing in the apartment building vestibule and she appeared scared, distraught, and was crying. (Exh. 7, Off. Macugowski Dep. pg.71:5-15).

19. Officer Macugowski asked Eve "what were the circumstances that she felt the need to call 911? Exh. 7, Off. Macugowski Dep. pg.69:1-6). Eve responded with the following:

> "She said that she was with her dad. The reason she was with him is because she is his favorite daughter from the first marriage because she is the only one that puts up with him when he drinks. She had been with him for a week. Allegedly, he ha[d] been drinking cognac and beer the whole week. When he spilled his beer and he told her to go get another one, that is when the whole domestic argument started where he started throwing objects at her - beer cans, her purse – calling her a whore because she has a child but she has never been married. When she got scared from him chasing her and throwing everything at her, that is when she ran out and gave us a call." (Exh. 7, Off. Macugowski Dep. pg.69:4-22).

20. The Officers and Eve then proceeded to Plaintiff's third floor apartment while Eve remained on the landing between the second and third floors. (Exh. 7, Off. Macugowski Dep. pg.19-20; Exh. 13, ISP Scene photographs disk 1, IMG_219-221, 227-232_JPG).

21. The apartment complex has at least nine separate buildings. (Google Maps, last visited on February 5, 2015 https://www.google.com/maps/place/3221+W+Parkway +Dr+Northbrook,+IL+60062/@42.0941695,87.8757388,193m/data=!3m1!1e3!4m2!3m1!1s0x88 0fb85e6972c9ef:0xfb089af72a158e70).

22. Plaintiff's apartment was located in a three story building which contained four units on each of the three floors. (Exh. 4, CCSPD Dispatch transcript Vol. 1 pg.20:13-24, 21:1-10; Exh. 13, ISP Scene photographs disk 1, IMG_227-232_JPG).). As pictures of the scene indicate, the front doors of the three other apartments on the third floor are all within eight feet of each other. (Exh. 13, ISP Scene photographs disk 2, IMG_300-310_JPG).

23. The Officers knocked on Plaintiff's door, and in full uniform, announced their office. (Exh. 7, Off. Macugowski Dep. pg.10:1-14, 20-21; Exh. 5, ISP Investigation Summary pg.0029-0030).

24. Plaintiff partially opened the door approximately three to four inches. (Exh. 6, Off. Prohaska Dep. p.14:16, 18-20; 15:12). The apartment was dark inside so Officer Prohaska could only see Plaintiff's face and bare chest. (Exh. 6, Off. Prohaska Dep. pg.16:3-13).

25. Officer Macugowski stated "[s]ir, you need to come out, open the door and speak to me to find out what is going on." (Exh. 7, Off. Macugowski Dep. pg.25:1-10).

26. Plaintiff responded that he will not let the Officers "rob him" and that "it is his house" and he would "defend his house to the end." (Exh. 7, Off. Macugowski Dep. pg.28:9-16; ISP Investigation Summary pg.0030, Exh. 3, CCSPD Dispatch audio diskette "track" 3 at 04:54-5:05; Exh. 4 CCSPD Dispatch transcript Vol. 1 pg.7:14-16).

27. Plaintiff then suddenly "thrust" a "large sword" towards Officers Prohaska and Macugowski. (Exh. 6, Off. Prohaska Dep. p.16:3-13; 17:10-13; 20:16-18; Exh. 7, Off. Macugowski Dep. pg.25:1-15, 27:7-19).

28. At the time, the Officers were only standing an "arm's length" away from the door and the blade came within a "couple inches from [their] body." (Exh. 6, Off. Prohaska Dep. pg.20:5-23, Exh. 7, Off. Macugowski Dep. pg.25:5-21, 28:1-3)

29. Plaintiff attempted to stab with the sword Officers two or three more times through the open door. (Exh. 6, Off. Prohaska Dep. pg.23:21-24; 24:1-3; Exh. 7, Off. Macugowski Dep. pg.25:1-15, 39:9-21).

30. Officer Prohaska stepped back away from the door, drew his weapon, and told Plaintiff to "drop it, get down!" (Exh. 6, Off. Prohaska Dep. pg.18:4-6). Plaintiff refused, and instead held onto the sword with both hands and stated "if someone is going to come in, they are going to die." (Exh. 6, Off. Prohaska Dep. pg.20:6-8, 27:16-20; Exh. 7, Off. Macugowski Dep. pg.41:2-6).

31. In an effort to "deescalate" the situation, Officer Macugowski responded "[n]obody has to die. Just put down the sword because if you keep it up you are going to get sprayed" with oleoresin capsicum ("OC"). (Exh. 7, Off. Macugowski Dep. pg.33:2-12, 41:10-13).

32. Officer Macugowksi realized the OC spray would have been "useless" considering Plaintiff was intoxicated, he was partially shielded by the door, and with "spray versus a samurai sword, obviously the sword is going to win." (Exh. 7, Off. Macugowski Dep. pg.32:1-16, 34:1-4).

33. Plaintiff then slammed the door shut before "engaging the deadbolt" lock. (Exh. 7, Off. Macugowski Dep. pg.41:14-23). Once again Officer Macugowski asked Plaintiff to exit the apartment without the sword but he did not respond. Exh. 7, Off. Macugowski Dep. pg.44:1-6).

34. At approximately 4:09 p.m., Officer Macugowski radioed CCSPD Dispatch that the "[s]ubject's door is partially open. 36 has view of the subject holding a Samurai sword inside the apartment." (Exh. 3, CCSPD Dispatch audio diskette "track" 3 at 01:38-02:50; Exh. 4, CCSPD Dispatch transcript Vol. 1 pg.5:3-19).

35. The Officers then escorted Eve to their squad car and took up defensive positions in the hallway as they waited for additional officers to arrive. (Exh. 5, ISP Investigative Summary, pg.0014).

36. At approximately 4:14 p.m., the dispatcher provided additional information over the radio:

> "He's got a revoked FOID card, revoked FOID card. Positive response on his CQH ["Criminal Questionable History"]. It's going to be a total of four arrests: six charges, no conviction, for traffic; one charge, no conviction, dangerous drugs; one charge, no conviction, for assault; last arrest is an '08 by an Arlington Heights PD for a domestic battery." (Exh. 3 CCSPD Dispatch audio diskette "track" 3 at 07:250-08:00; Exh. 4 CCSPD Dispatch transcript Vol. 1 pg.823-24, 9:17-24).

37. Once Plaintiff closed the door Officer Prohaska heard a "metal clank" that could have been a "latch, a gun, a sword going back in the scabbard. I don't know." (Exh. 6, Off. Prohaska Dep. pg.24:2-7).

38. CCSPD Officers Larry Rivlin and Roger Valdez arrived on the scene at approximately 4:20 p.m. (Exh. 2, CCSPD Dispatch call log pg. 2; Exh. 4, CCSPD Dispatch transcript Vol. 1 pg.11:3-7).

39. At approximately 4:22 p.m., the following radio exchange occurred:

**Off. Rivlin**: "734 [Off. Rivlin] to 36 [Off. Macugowski]. Did you say there might be firearms inside there?"

**Off. Macugowski:** "10-4. Per the daughter, he had a friend with a gun, but she doesn't know what happened with the gun. And he does have an FOID revoked." (Exh. 3 CCSPD Dispatch audio diskette "track" 3 at 10:10-10:25; Exh. 4 CCSPD Dispatch transcript Vol. 1 pg.11:17-20)

40. Officer Prohaska proceeded to evacuate the building of all tenants. (p.36:9-10). "We banged on every door, got everybody out." (Transcript. p.16:17-18). (4:47 p.m.)

## Second Encounter with Plaintiff

41. The CCSPD dispatch contacted the Glenview Fire Department ("GFD") and Glenview Police Department ("GPD") to respond and provide assistance. (Exh. 4 CCSPD Dispatch transcript Vol. 1 pg.7:3-6, 8:17-20, 10:16-20)

42. GPD Officers Jeffery Cholewinski and Eric Eastman arrived on the scene and they were briefed by CCSPD officers regarding what had occurred. (Exhibit 8, GFD Officer Cholewinski Deposition pg.9:11-14, 14:1-17).

43. The GPD Officers retrieved a ballistic shield from their squad car and provided it to Officer Valdez. (Exh. 8, Off. Cholewinski Dep. p.14:22-24, 15:1-8; ISP Investigatory Summary pg.13,16). The GFD Officers then positioned themselves on the landing between the second and third floor. (Exh. 8, Off. Cholewinski Dep. pg.20:18-24; ISP Investigatory Summary pg.14, 17; Exh. 13, ISP Scene photographs disk 1, IMG_219-221_JPG).

44. Officers Rivlin and Valdez were positioned on the steps directly below the third floor landing and Plaintiff's apartment door. (Exhibit 9, CCSPD Officer Rivlin Deposition, pg. 90:4-8; Exhibit 13, ISP Scene photographs disk 1, IMG_227-232_JPG).

45. Officer Rivlin attempted to verbally engage Plaintiff by stating that his "daughter

8

was worried about him" and assuring him that no one was there to hurt him. (Exh. 9, Off. Rivlin Dep. pg.162:1-14; Exhibit 10, CCSPD Officer Gary Contreras Dep. pg.164:12-21).

46. Plaintiff responded by stating "[f]uck you. I'm going to kill you and then kill myself." *Id.*

47. Once again, Officer Rivlin heard a "metal-on-mental" sound like "someone was loading a gun." (Exh. 9, Off. Rivlin Dep. pg. 91:).

48. As Officers Rivlin and Valdez were positioned at the top of the stairs, Plaintiff opened the door with the sword in his hand for approximately ten seconds. (Exh. 9, Off. Rivlin Dep. pg. 94:3-8, 95:1-3, 96:2-5).

49. Officer Rivlin yelled for Plaintiff to "drop the sword" and "come on out" several times before Plaintiff disregarded his commands and closed the door. (Exh. 9, Off. Rivlin Dep. pg.96:8-10).

50. Officer Rivlin continued his efforts to communicate with Plaintiff by pleading with Plaintiff to speak with them over a cell phone. Plaintiff responded, "do you think I am stupid, if you touch the door, I will kill you." (ISP Investigative Summary, 0012).

51. At this time, Officer Rivlin recommended that the CCSPD Hostage Barricade Team ("HBT") be notified and the CCSPD command ordered that the team respond to the scene. (Exh. 9, Off. Rivlin Dep. pg.78:1-24, 79:1-6).

52. The CCSPD command ordered that officers create a HBT "staging area" to position the CCSPD "Ballistics Vehicle", notify the ISP that squad cars would be rapidly responding to the scene via various State highways, and notify area hospitals to prepare for potential injuries. (Exh. 4, CCSPD Dispatch transcript Vol. 1 pg.14:19-22, 15:1-12, 17:4-8, 24:3-24; 25:1-16, 36:2-7).

53.     The CCSPD command also requested the officers at the scene "gather intelligence" which included photographing the complex and describing the physical layout of the area. (Exh. 4, CCSPD Dispatch transcript Vol. 1 pg.20:2-24, 21:1-10, 23:1-7).

54.     At approximately 4:47 p.m. a CCSPD supervisor stated over the radio:

"You may consider talking with Larry Rivlin about at least having a react team together with a (unintelligible) team and at least force just in case this offender decides to come out and challenge you guys."
"All right. 10-4"
"Obviously, if he doesn't, just hold it."  (Exh. 4, CCSPD Dispatch transcript Vol. 1 pg.15:21-24;  16:1-2).

### Officer Contreras

55.     Officer Contreras received the original department-wide dispatch radio-call(s) stating that "Subject with a sword . . . may be suicidal" and that Plaintiff was barricaded and may be in possession of a firearm. (Exh. 5, ISP Investigative Summary pg.0019; Exh. 10, Off. Contreras Dep. pg.44:18-24, 45:1-5).

56.     As a member of the HBT, Officer Contreras also received a page instructing the team members to respond to a "code red incident" which meant "there may be possibly a barricade subject, maybe some weapons involved, some type of threat to life." (Exh. 10, Off. Contreras Dep. pg.163:19-24, 163:1).

57.     At approximately 5:00 p.m., Officer Gary Contreras arrived on the scene. (Exh. 2, CCCSPD Dispatch call log pg.4). Upon arrival, Officer Contreras was informed by CCSPD Lieutenant Percy Obosco what he had already heard over the radio, namely, that Plaintiff had "barricade himself upstairs, that he had threated to kill himself and the police." (Exh. 10, Officer Gary Contreras Deposition pg.47:13-17)

58. Officer Contreras was also informed that Plaintiff had "repeatedly tried to stab at [the officers] before shutting the door". (Exh. 10, Officer Gary Contreras Deposition pg.164:2-11).

59. At approximately 5:13 p.m. the following radio transmission occurred:

"Okay. Incoming units on Band 5, HBT. Our suspect, perhaps, is loading a long gun in the apartment. It sounds like he's loading a rifle in the apartment, and he's barricading the front door. The front door is the only access way." Exh. 4, CCSPD Dispatch transcript Vol. 1 pg.27:2-6).

### Final Encounter with Plaintiff

60. Based on his training and the CCSPD commander's directive to establish a "react team", Officer Rivlin would attempt to subdue Plaintiff with his taser, Officer Valdez would provide cover with his ballistic shield, Officers Cholewinski and Easton would attempt to handcuff Plaintiff once he was tased, and Officer Contreras would provide "lethal" cover. (Exh. 5, ISP Investigative Summary pg.0019; Exh. 9, Off. Rivlin Dep. pg.97:21-24, 98-99, 107:1-23).

61. Providing "lethal cover" was an HBT term that meant if "non-lethal" force was ineffective in stopping a threat of great bodily harm or death, then the officer providing lethal cover would use deadly force. (Exh. 10, Off. Contreras Dep. pg.117:7-15).

62. Officers Cholewinski and Eastman were still positioned on the landing between the second and third floor. (Exh. 8, Off. Cholewinski Dep. pg.20:18-24; ISP Investigatory Summary pg.14, 17; Exh. 13, ISP Scene photographs disk 1, IMG_219-221_JPG).

63. While Officers Rivlin and Valdez were positioned on the steps directly below the third floor landing and Plaintiff's apartment door. (Exhibit 9, CCSPD Officer Rivlin Deposition, pg. 90:4-8; Exhibit 13, ISP Scene photographs disk 1, IMG_227-232_JPG).

64. Officer Contreras took his position on the stairs leading to the landing between the second and third floors. (Exh. 10, Off. Contreras Dep. p.95:11-22, 98:4-24).

65. Plaintiff swung his door open quickly and aggressively with the sword in hand. (Exh. 5, ISP Investigative Summary, 0017). Plaintiff then stepped out of the apartment, prompting Rivlin to yell, "drop the sword" three or four times, and "let me see your hands," but Plaintiff refused. (Exh. 9, Off. Rivlin Dep. pg.117:1-23; ISP Investigative Summary, 0007, 0017).

66. Officer Contreras observed Officer Rivlin "come out behind" the ballistic shield in order to discharge the taser. (Exh. 10, Off. Contreras Dep. pg.177:4-24). In doing so, Officer Rivlin "expose[d] himself a great deal in order to try and use the non-lethal device." (Exh. 10, Off. Contreras Dep. pg.177:4-24).

67. Officer Rivlin observed Plaintiff take a step towards the Officers and "simultaneous[ly]" raised the sword. (Exh. 9, Off. Rivlin Dep. pg.118:13-20, 119:1-23). At that time, Officer Rivlin and Officer Valdez were only "two to three" feet away from Plaintiff. (Exh. 9, Off. Rivlin Dep. pg.147:10-14)

68. As Plaintiff then lifted the sword as his body faced Rivlin, prompting Rivlin, in fear of "literally" being decapitated, to discharge his taser. (Exh. 9. Off. Rivlin Dep. pg.170-171; Exh. 5, ISP Investigation Summary pg.0012)

70. Officer Contreras "heard the taser go off. My weapon was on safe when the taser went off. When I saw that the deceased did not drop and he was raising a sword up, I took my weapon off safe and I depressed the trigger, firing one round and putting my weapon on safe." (Exh. 10, Off. Contreras Dep. pg.144:5-14).

71. Officer Contreras fired the shot "because the taser did not effectively stop the deceased. And when I observed that his sword was coming off the ground toward Officer Rivlin, I knew that Officer Rivlin's life was in jeopardy or he may be mangled or receive some type of

great bodily harm. And it's my job not to allow that to happen to another officer to anyone, any innocent civilian." (Exh. 10, Off. Contreras Dep. pg.117:7-24, 118:1-4)

72. The Officers entered Plaintiff's apartment, restrained him, and the paramedics "were there almost immediately" to begin rendering medical assistance. (Exh. 8, Off. Rivlin Dep. pg.137:6-24, 139:21-24, 140:1-12).

**CCSPD Officers Training and Expertise**

73. Both Officer Gary Contreras and Larry Rivlin have received the following training in the use of firearms and use of force while their capacities as Cook County Department of Corrections ("CCDOC") officers, CCSPD officers, and HBT members: 1) CCDOC training academy that consisted of 480-hours of instruction (Exh. 9, Off. Rivlin Dep. 7:12-24, 8:1-6, Exh. 10, Off. Contreras Dep. pg.15-16, Exhibit 15, Officer Brian Hartsfield Deposition pg.6-7); 2) CCSPD training academy that consisted of an additional 440-hours of instruction (Exh. 9, Off. Rivlin Dep. 8:7-17; Exh. 10, Off. Contreras Dep. pg.17:3-24; Exh. 15, Off. Hartsfield Dep. pg.6-8); 3) HBT training that included an initial 40-hour course and 16-hours of training a month in the areas including firearms and use of force (Exh. 9, Off. Rivlin Dep. 10:5-24; Exh. 10, Off. Contreras Dep. pg.20:5-15, 21:23-24); 4) and 16-hours of annual CCSPD "in-service" training which includes firearm recertification. (Exh. 15, Off. Hartsfield Dep. pg.12:6-21, 13:3-8)

74. In addition to the approximately 960-hours of academy training, 16-hours of monthly HBT training, and 16-hours of annual "in-service" training; Officer Contreras has received approximately 208-hous of additional training since he joined the CCSPD in September 2005 until the incident occurred on January 24, 2010. (Exhibit 14, CCSPD Training records for Officers Rivlin and Contreras pg.1-3).

75. According to Officer Rivlin's and Officer Contreras' training, a sharped edge weapon like Plaintiff's sword is able to pierce a ballistic shield and ballistic vest. (Exh. 9, Off. Rivlin Dep. 18:11-19, 150:2-7; Exh. 10, Off. Contreras Dep. pg.64:7-24, 177:10-24)

76. As a result, Officer Contreras believed the ballistic shield or vest(s) would not prevent Plaintiff's sword from seriously wounding or killing Officer Valdez, or Officer Rivlin based on Plaintiff's proximity to the officers. (Exh. 10, Off. Contreras Dep. pg.64:7-24, 177:10-24).

## Medical Examination of Plaintiff

77. On January 25, 2010, the Cook County Medical Examiner's Office Forensic Pathologist, Dr. James Filkin, performed the autopsy of Plaintiff. (Exhibit 11, Dr. James Filkin Deposition pg.6:1-2, 9:1-3, Exhibit 12, Plaintiff's Postmortem Examination pg.1)

78. Once Dr. Filkin was informed that CCSPD Officers attempted to taser Plaintiff, he "thoroughly reexamined the body" and only found injuries "so very superficial involving only the outermost layer of the skin that they don't pierce more deeply and, therefore, don't provide any characteristic appearance that would indicate a defect produced by a dart, a barb or anything like that. There could have equally been produced by a fingernail, a scratch from a fingernail by someone involved in the medical care of this individual." (Exh. 11, Dr. Filkin Dep. pg.69:15-24, 70:1-18)

79. Dr. Filkin also examined Plaintiff's bullet wound and found a "concentric rim of abrasion" which means the "rim is more or less of an even thickness around the bullet hole." (Exh. 11, Dr. Filkin Dep. pg.77:22-24, 78:1). Based on the wounds "concentric" nature, Dr. Filkin could determine that the bullet entered Plaintiff's body at a 90-degree or right angle. (Exh. 11, Dr. Filkin Dep. pg.78:9-24).

80. Based on the wounds "concentric" nature Dr. Filkin stated Dr. Filkin the "individual who was shot would have to be standing straight up… At the time the bullet struck the body, the shooter or the muzzle of the gun would have to be more or less in front of the individual." (Exh. 11, Dr. Filkin Dep. pg.84:3-24, 85:1-14). Dr. Filkin was provided the following scenario and gave the following answer:

> "Q. Doctor, based on your findings that it was a concentric rim of abrasion for the wound entry and if the shooter was approximately six to seven feet below Mr. Kolgovas, the bullet wound indicates that he would be leaning forward or lunging forward at the time of the shooting?
>
> A. Well, the hypothetical you gave me where he might be in a forward position would be consistent with the appearance of the rim and also consistent with the bullet would path through the body, could be. So that's a scenario that might work." (Exh. 11, Dr. Filkin Dep. pg.92:5-21)

Respectfully Submitted,
ANITA ALVAREZ
State's Attorney of Cook County

*/s/ Michael L. Gallagher*
Michael L. Gallagher
Assistant State's Attorney
500 Richard J. Daley Center
Chicago, IL 60602
(312) 603-3124