# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| TRISHA HINOJOSA, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 13 CV 9079 |
| v. | ) | |
| | ) | Honorable Judge Joan H. Lefkow |
| SHERIFF OF COOK COUNTY, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

NOW COME Defendants, Sheriff Thomas Dart, Cook County and Officer Gary Contreras, by their attorney, Anita Alvarez, State's Attorney of Cook County, and through her assistant, Michael L. Gallagher, and submit this Memorandum of Law in support of their Federal Rules of Civil Procedure Rule 56 Motion for Summary Judgment.

## INTRODUCTION

Plaintiff Trisha Hinojosa ("Plaintiff" or "Decedent's wife") brings this action pursuant to the Civil Rights Act 42 U.S.C. §1983 and Illinois State law claims of wrongful death, survival, and negligence. (Dkt. 17, Plaintiff's Second Amended Complaint).  In particular, Plaintiff alleges that Officer Gary Contreras and the Cook County Sheriff' Thomas Dart ("CCSPD" or "Sheriff's Police") acted unreasonably when Officer Contreras fatally shot Plaintiff Arturas Kolgovas ("Plaintiff" or "Decedent"). *Id.* However, Plaintiff has failed to produce *any* evidence that Officer Contreras did not reasonably fear for his life or the lives of other officers, or that Plaintiff did not reasonably pose a serious risk of imminent harm.

The *unrefuted* record establishes that on January 24, 2010, Police were called to Plaintiff's residence in response to a violent domestic dispute between him and his teenage

daughter, Eve. (Defendants' Fed. R. Civ. P. Rule 56.1(a) Statement of Facts ¶ 8). The CCSPD 911 Dispatcher made a department-wide radio call informing the officers of the following: Plaintiff had a history of suicide attempts, had numerous prior arrests, had a history of fighting the police, was highly intoxicated, may be in possession of a firearm, had attempted to stab uniformed officers, and had repeatedly threatened to kill them and himself, all while being armed with a "Samurai" sword. (56.1(a) ¶¶ 10, 15, 19, 27-29, 46-50).

Upon arriving at the scene, the officers made repeated and prolonged attempts to verbally engage the Plaintiff in the hopes of deescalating the situation. (56.1(a) ¶¶ 25, 31, 45, 49). Plaintiff completely disregarded these efforts, and instead continued to threaten to kill the officers and then himself. (56.1(a) ¶¶ 30, 50, 57). Finally, Plaintiff came out of his apartment holding his weapon and refused the officers' repeated commands to drop the sword. (56.1(a) ¶¶ 65). Plaintiff proceeded to step towards the officers while simultaneously raising his sword towards the officers positioned only a few feet away. (56.1(a) ¶¶ 67-68). Fearing for the lives of his fellow officers, Officer Contreras fired a single shot in an attempt to subdue Plaintiff which resulted in his death. (56.1(a) ¶¶ 70-71). In sum, the record clearly establishes that Officer Contreras' use of force was justified considering Plaintiff posed a risk of serious physical harm to both he and his fellow officers.

## STATEMENT OF FACTS

Plaintiff had a significant history of suicide attempts and conflicts with the police. On April 24, 2008, CCSPD responded to a check for wellbeing at Plaintiff's residence. (56.1(a) ¶ 1). Although Plaintiff would not open the door, police gained entry and found Plaintiff lying on the couch, having written several suicide notes. (56.1(a) ¶ 1, 3). As a result, the responding CCCSP officers believed Plaintiff was a threat to himself and he was involuntarily admitted to the

hospital for care. (56.1(a) ¶ 4). On January 4, 2009, once again CCSPD officers responded to Plaintiff's residence where they were informed by Plaintiff's wife, Trisha Hinojosa, that he was suicidal and threatening to drink himself to death. (56.1(a) ¶¶ 5-6). The officers contacted medical personnel before he was again involuntary admitted to a hospital. (56.1(a) ¶ 7).

On January 24, 2010, at approximately 4:00 p.m., Plaintiff was again highly intoxicated and demanded that his nineteen-year-old daughter, Eve, purchase more alcohol for him. (56.1(a) ¶¶ 8, 13-14, 19). When she refused, Plaintiff became enraged and attacked his daughter, forcing her to flee to another side of the apartment and lock herself in a bedroom where she called 911. (56.1(a) ¶¶ 14-16). On the CCSPD radio dispatch, Eve can be heard crying while she requested "can you come out here please." (56.1(a) ¶ 9). In response, the CCSPD 911 Dispatch immediately sent a department-wide radio message to Sheriff's Police requesting a check for wellbeing. (56.1(a) ¶ 10). As Eve waited for the officers to arrive, Plaintiff punched and kicked the door before forcing his way into the bedroom and yelling "it's time for you to let me go." (56.1(a) ¶ 15). Eve eventually managed to escape the apartment before she was greeted by the CCSPD officers. (56.1(a) ¶ 16).

Upon arrival, uniformed CCSPD Officers Ronald Prohaska and Henry Macugowski observed Eve standing in the vestibule of the apartment building where she stated that Plaintiff had been drinking for a week and attacked her when she refused to purchase him more alcohol. (56.1(a) ¶¶ 18-19). The Officers then proceeded to Plaintiff's apartment located on third floor where they knocked on his door and announced their office. (56.1(a) ¶¶ 20, 23). Plaintiff partially opened his door and began yelling that the Officers will not "rob him" and that "it is his house" and he would "defend his house to the end." (56.1(a) ¶ 26). Plaintiff suddenly and without warning, attempted to stab the officers several times by thrusting a "Samurai" style

sword through the opening in the door. (56.1(a) ¶ 27). The sword had an approximately seventeen inch-long blade that came within inches of the officers. (56.1(a) ¶ 28). Plaintiff disregarded the Officers repeated commands to drop his weapon before retreating back into his apartment, where he began making noises leading the officers to believe he was armed with a gun. (56.1(a) ¶¶ 30, 37, 39). Plaintiff shouted, "if someone is coming in, they are going to die!" (56.1(a) ¶ 30). At this time, information was being transmitted over the CCSPD Dispatch, which all responding officers could hear. This information included that Plaintiff was armed with a sword, that he may be armed with a gun, and that he had a revoked FOID card. (56.1(a) ¶¶ 34, 36, 39). The Dispatch also informed the officers that Plaintiff had prior suicide attempts and was willing to "fight police." (56.1(a) ¶ 10). Finally, the officers learned that Plaintiff had four prior arrests including charges of domestic battery and assault. (56.1(a) ¶ 36).

At approximately 4:20 p.m., CCSPD Officers Rogelio Valdez and Larry Rivlin, along with Glenview Police Department Officers Jeff Cholewinski and Eric Eastman, arrived at the scene. (56.1(a) ¶¶ 38, 42). Upon arrival, Officers Valdez and Rivlin positioned themselves on the steps directly below the third floor landing and Plaintiff's apartment door, while Officers Cholewinski and Eastman were located on the landing between the second and third floors. (56.1(a) ¶¶ 43-44). Officer Rivlin was a member of the CCSPD Hostage Barricade Team ("HBT"), and per his training, attempted to negotiate with Plaintiff to put down his weapon and exit the apartment without issue. (56.1(a) ¶¶ 44-45, 50). However, Plaintiff refused Officer Rivlin's requests and instead stated "[f]uck you. I'm going to kill you and then kill myself." (56.1(a) ¶ 46). The officers again heard racking sounds coming from inside the apartment, leading them to believe that Plaintiff was armed with a rifle. (56.1(a) ¶¶ 47, 55, 59).

In response, CCSPD command ordered the following: 1) notify all available HBT members of a "code red" and respond to the scene, 2) the responding officers establish a HBT "staging area" for both the "Ballistics Vehicle" and medical personnel, 3) gather "intelligence" regarding the apartment complex and the physical layout of the area, 4) establish a "react team", 5) and notify area hospitals to prepare for potential injuries. (56.1(a) ¶¶ 52-54, 56). In response, Officer Rivlin developed a plan to subdue Plaintiff with non-lethal force if he exited the apartment. (56.1(a) ¶ 60). Officer Rivlin instructed Officer Valdez to position himself at the top of the third floor stairs with a ballistics shield to provide cover, while Officer Rivllin would stand behind the shield and attempt to subdue Plaintiff with a taser. (56.1(a) ¶ 59). Officers Cholewinski and Eastman were located on the landing between the second and third floors and were designated to "go hands" and physically restrain Plaintiff once he was subdued. (56.1(a) ¶¶ 60-63). Finally, Officer Contreras was positioned on the stairs leading to the landing between the second and third floors and instructed to provide lethal cover. (56.1(a) ¶¶ 60-61, 64).

Soon thereafter, Plaintiff aggressively swung his door open holding the sword. (56.1(a) ¶ 65). The Officers shouted several times for Plaintiff to drop his sword, but he disregarded the orders and stepped towards Officers Rivlin and Valdez while simultaneously raising his sword. (56.1(a) ¶¶ 65, 67). As Officer Rivlin discharged his taser, Officer Contreras saw Plaintiff continue to raise his sword and fired a single shot, hitting Plaintiff in the upper chest. (56.1(a) ¶¶ 69-70). The Officers immediately entered Plaintiff's apartment, restrained him, and the paramedics "were there almost immediately" to begin rendering medical assistance. (56.1(a) ¶ 71). Dr. James Filkin is the Cook County Medical Examiner's Office's Forensic Pathologist that conducted the postmortem examination of Plaintiff. (56.1(a) ¶ 77). Dr. Filkin's did not find any physical evidence that the taser probes penetrated Plaintiff's skin. (56.1(a) ¶ 78). Moreover, the

doctor opined that the "concentric" nature of Plaintiff's bullet wound was consistent with Officer Contreras' testimony that he fired the single shot while positioned below Plaintiff and as he was lunging towards the officers with his sword. (56.1(a) ¶¶ 79-80).

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, deposition, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although the court must view all facts and reasonable inferences in favor of the nonmoving party, *Samuelson v. LaPorte Cnty. Sch. Corp.,* 526 F.3d 1046, 1051 (7th Cir. 2008), those inferences must be both reasonable *and* find support in the record. *See Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010)(emphasis added). The court is also not required to draw "[i]nferences that are supported by only speculation or conjecture." *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008)(quoting *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004)).

Summary judgment must be entered against the non-moving party where that party "fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A party who will bear the burden of proof on a particular issue at trial may not rest on the pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986)(citing FRCP Rule 56(E)). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Faas v. Sears, Roebuck & Co*., 532 F.3d 633, 640-41 (7th Cir. 2008).

**ARGUMENT**

All claims that law enforcement officers have used excessive force in the course of an investigatory stop or other "seizure" of a free citizen should be analyzed under the Fourth Amendment's "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Determining this reasonableness requires a careful balancing of "the nature and quality of the intrusion . . . against the countervailing government interest at stake." *Id.* at 396. However, the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* Police may use deadly force if the suspect poses a threat of serious bodily harm, either to the officer or to others. *Bell v. Irwin*, 321 F.3d 637, 639 (7th Cir. 2003). Importantly, "if the suspect threatens the officer with a weapon, that risk has been established." *Id.* "Thus, when an officer believes that a suspect's actions place him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002). The same rule applies to Plaintiff's wrongful death claim under Illinois law. *See* 720 ILCS 5/7-5; 740 ILCS 180/1. In this case, Officer Contreras clearly acted reasonably when he fired a single shot to prevent Plaintiff from inflicting serious bodily harm against his fellow officers who were only feet away from Plaintiff and his sword.

**I.  Plaintiff's Claim for Excessive Force Must Fail Because Officer Contreras' Use of Deadly Force was Reasonable**

In order to succeed in her claim for excessive force, Plaintiff must prove that Officer Contreras did not act reasonably when he fired a single shot to prevent Plaintiff from causing injury or death to his fellow officers. In this case, however, Plaintiff was armed, highly intoxicated, suicidal, and fully intended to use his weapon to kill or seriously injure the officers.

There is absolutely no question that Officer Contreras' split-second decision was reasonable under the pressures of this particular situation.

### A. Responding Officers Reasonably Believed Plaintiff Posed a Serious Threat of Imminent Harm

Information provided to the responding officers that Plaintiff had prior suicide attempts, a criminal record which included "fighting police," was heavily intoxicated, had verbally threatened to kill the officers and himself, and had attempted to stab the officers with a Samurai sword *clearly* established that Officer Contreras and the other officers knew Plaintiff was extremely dangerous. (56.1(a) ¶¶ 10, 15, 19, 27-29, 46-50); *see Bell v. Irwin*, 321 F.3d 637, 639 (7th Cir. 2003).

While responding to this violent domestic dispute, Officer Contreras heard over the police radio that the suspect was arrested several times and police frequently were called to visit his home. (56.1(a) ¶ 10). He also knew of Plaintiff's possession of the sword, that he may have had a loaded rifle in his possession, and that instead of obeying officer requests, he was yelling that he would kill the officers and then kill himself. (56.1(a) ¶¶ 55, 57-59). Officer Contreras also witnessed Plaintiff open his door, refuse repeated commands to drop the sword, and advance toward the officers. (56.1(a) ¶¶ 48-49, 65-70). Plaintiff then lifted his sword toward Officers Rivlin and Valdez, who was only several feet away, causing Officer Contreras to reasonably believe that there was a serious risk of harm forced and forced him to use lethal force to subdue the threat. (56.1(a) ¶¶ 66-70). Based on the direct and circumstantial evidence, Officer Contreras was keenly aware that Plaintiff was a violent and dangerous person whose threats were to be taken with the utmost seriousness in this situation.

**B.      With this Knowledge, Officer Contreras was Justified in Using Deadly Force**

The Seventh Circuit has held that an officer acts reasonably in using deadly force if the officer knows the suspect has a history of violence, is known to carry a weapon or may be carrying a weapon at the time of the encounter, is acting irrationally, disregards police instructions, and approaches and poses a danger to the officers. *DeLuna v. City of Rockford, Ill.*, 447 F.3d 1008, 1012 (7th Cir. 2006). In *DeLuna,* the Seventh Circuit reemphasized that reasonableness is "not based on hindsight, but rather by considering the perspective of the officer on the scene, allowing for the fact that officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham*, 490 U.S. at 396-97).

The officer in *DeLuna* was also responding to a domestic disturbance with an intoxicated suspect who was known to be violent and had a history of arrest. *DeLuna*, 447 F.3d at 1010-011. The Court found the officer's use of deadly force to be reasonable because the officer knew of the suspect's violent history, the suspect disregarded police commands, and the suspect advanced toward the officer. *DeLuna*, 447 F.3d at 1010-012.  Even though the suspect was *unarmed*, had no history of suicide attempts, and was almost 15 feet away from the officer at the time of the shooting, the suspect's bizarre conduct coupled with the action of lunging towards the officer after threatening him established a real danger of imminent serious bodily injury.[1] *Id.* at 1013. The Seventh Circuit emphasized that the officer need not wait until there is a physical struggle before an imminent danger of serious injury exists. *Id.*; *see Muhammed*, 316 F.3d at 682-83 (plaintiff was ordered by officers to stop, but instead, he pointed a gun at the officers and ducked behind a car. The Court found that the officer used reasonable force in firing his weapon four

---

[1] As in this case, DeLuna made threats to the responding officer that included "I've got something for you. You are going to have to kill me." *DeLuna,* 447 F.3d at 1011.

times because he reasonably feared for his life.); *see also Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003) ("It is easy in retrospect to say that officers should have waited, or should have used some other maneuver – these propositions cannot be falsified – but *Graham* makes it clear that the fourth amendment does not require second guessing if a reasonable officer making decisions under uncertainty and the press of time would have perceived the need to act.").

In the present case, because Plaintiff was acting irrationally, threatened to kill officers, and had advanced towards the officers while lifted his sword, Officer Contreras's split-second decision to use deadly force was clearly justified. (56.1(a) ¶¶ 65-671).

### Applying the Law to Our Facts, Plaintiff's Claim Must Fail

In this matter, Defendants have established facts that are *even more* compelling than facts previously deemed reasonable to justify the use of deadly force. Beginning with Plaintiff's criminal history, combined with the information provided over the police radio, these officers were keenly aware of the fact that Plaintiff was a police fighter, was suicidal, and was intent on seriously injuring police officers and himself that day. (56.1(a) ¶¶ 9, 44-45, 52-53, 59). In the twenty-months prior to the incident, CCSPD officers had been called to Plaintiff's residence on two separate occasions because of Plaintiff's suicidal ideations. (56.1(a) ¶¶ 1-7). Plaintiff also repeatedly shouted that he was going to kill police officers and then kill himself. (56.1(a) ¶¶ 52-53, 59). Furthermore, officers repeatedly heard racking sounds coming from inside the apartment, causing them to believe Plaintiff was also armed with a rifle. (56.1(a) ¶¶ 24, 47, 54). Entering this tense and uncertain situation, Officer Contreras knew that he may be forced to use his weapon to subdue this violent and irrational suspect from a deadly attack on officers.

When Officer Contreras arrived on the scene, everything he heard over the police radio was confirmed, as Plaintiff continued to shout that he intended to kill police officers. (56.1(a) ¶¶

52-53). Plaintiff refused to have a conversation with the officers, and refused to drop his weapon even after several requests by officers. (56.1(a) ¶¶ 53, 65). The officers attempted to engage in negotiations with Plaintiff for approximately an hour and a half, but to no avail. (56.1(a) ¶ 53). In order to protect their own safety, the officers developed a plan in case Plaintiff came out of his apartment again. (56.1(a) ¶ 59).

Plaintiff did come out again, and this time, swung his door open, and approached officers with his sword. (56.1(a) ¶ 65). There were six officers in the stairwell, and they shouted for Plaintiff to drop the sword, but he refused, and instead advanced toward two officers that were who were only armed with a ballistics shield and a taser. (56.1(a) ¶ 66). However, neither the ballistic shield nor the ballistic vests are designed to repel an edged weapon like Plaintiff's sword. (56.1(a) ¶¶ 75-76). These officers were only a step or so away from Plaintiff as he lifted his sword upward towards them. (56.1(a) ¶¶ 65-68).

With all of this going on, Officer Contreras had the duty of protecting his fellow officers. (56.1(a) ¶ 59). (consider adding - Plaintiff was originally shirtless, however, when he came out to challenge police, he had put several layers of clothing on, perhaps arming himself against effective use of a Taser). Officer Contreras' duty was to use lethal force, if in his judgment, it was necessary to protect the safety of his fellow officers. (56.1(a) ¶ 59). With the knowledge that Plaintiff was refusing to drop the sword, that Plaintiff had threatened to kill officers, that Plaintiff was within striking distance, and that it would only take a split-second for Plaintiff to attack and kill his fellow officer, Contreras acted, using a limited amount of force. *See Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998). (Finding that a suspect armed with an edged weapon, within twenty-one feet, can injure or potentially kill an officer before he or she can fire a shot).

## II.     Plaintiff's Claim of "Failure to Train" Must Fail.

Plaintiff's argument that Sheriff Dart and the CCSPD is liable for failing to "instruct, supervise, control and discipline" Officer Contreras is absolutely baseless. (Plaintiff's Second Amended Complaint Dkt.17 pg.8-9). The courts allow *extremely limited* circumstances in which an allegation for failure to train can be a basis for liability under section 1983. *City of Canton, OH v. Harris*, 489 U.S. 378, 387 (1989). Inadequacy of police training may serve as a basis for section 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom police come into contact. *Id.* at 388.  This "deliberate indifference" standard is consistent with the rule from *Monell* that a city is not liable under section 1983 unless a "policy" or "custom" is the moving force behind the constitutional violation. *Id.* at 389. The Supreme Court in *Connick v. Thompson* indicated that a "pattern of similar constitutional violations by untrained employees" is necessary "to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011).

The Seventh Circuit has been consistent with the *Canton* and *Connick* decision, holding that adopting a lesser standard would open municipalities to unprecedented liability under section 1983. *Palmquist v. Selvik*, 111 F.3d 1332, 1344 (7th Cir. 1997). Plaintiff must prove that the county failed to train its police officers in a "relevant respect" and that the failure to train evidences a "deliberate indifference to its citizens' rights." *Id*. A municipality will be held liable for the violation of an individual's constitutional rights for failure to train its officers only when the inadequacy in training amounts to a deliberate indifference to the rights of the individuals with whom the officers come into contact. *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007).

Proving deliberate indifference, however, requires more than just a showing of simple or even heightened negligence. *Id.* The Seventh Circuit has expounded that it will find deliberate indifference on the part of policymakers only when such indifference may be considered a municipal policy or custom, and usually only in one or two circumstances. *Id.* "First, a municipality acts with deliberate indifference when, in light of the duties assigned to specific officers or employees the need for more training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the deficiency exhibits deliberate indifference on the part of municipal policymakers. Alternatively, we may find deliberate indifference when a repeated pattern of constitutional violations makes the need for further training . . . plainly obvious to the city policymakers." *Id. See also Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008).

## A. All Officers Involved were both Experienced and Well-Trained for this Situation

Plaintiff has failed to produce any evidence that CCSPD failed to adequately train the officers involved. Not only were all officers both experienced and well-trained, they followed procedure in difficult and uncertain circumstances. (56.1(a) ¶ 73-74). In order to succeed on a claim for failure to train, Plaintiff must prove not only that there is a custom or policy within CCSPD of defective training, but also that the defective training actually caused Plaintiff's injury, and amounted to deliberate indifference to Plaintiff's constitutional rights.

Not only has Plaintiff failed to show a constitutional violation on the part of CCSPD training. They have failed to prove that there was a policy or custom used by CCSPD that was the motivating force behind the alleged violation. HBT is a special unit, essentially a SWAT Team, and these officers were experienced and trained to deal specifically with these situations. The HBT team stepped in for regular officers to handle this barricaded and dangerous subject,

and after first attempting to negotiate with Plaintiff, developed a plan to protect their own lives in the event that Plaintiff threatened them.

**B. The Alleged Failure to Train Does not Reach the Level of Deliberate Indifference**

Plaintiffs have failed to produce any evidence that the need for further training was "so obvious," or that there was a "repeated pattern of constitutional violations" making the need for further training "plainly obvious to city policymakers." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). At the time of this incident, Officers Rivlin, Valdez, and Contreras alone had a combined forty years of experience at CCSPD. As part of the Hostage Barricade Team, Officers Rivlin and Contreras were in the most elite and well-respected unit of CCSPD. HBT officers undergo constant trainings every two weeks, year-round, and are prepared to deal with stressful and combative situations like this one. (56.1(a) ¶ 73-74). As a result, Plaintiff claim that Sheriff Dart or the CCSPD failed to "instruct, supervise, control and discipline" must fail.

**III.     Plaintiff has failed to set forth valid State law claims against Sheriff Dart and Officer Contreras.**

**A.     Plaintiffs' State law claims are barred by the Illinois Tort Immunity Act.**

The purpose of the Illinois Tort Immunity Act ("Act") is to protect local public entities and public employees from liability arising from the operation of government. 745 ILCS 10/1-101.1.(a). Sheriff Dart is a local public entity and Officer Contreras is his "employee" within the meaning of the Act. *See* 745 ILCS 10/1-202; *Carver v. Sheriff of La Salle County*, 203 Ill. 2d 497, 512 (2003); 745 ILCS 10/1-206. Significantly, no exception for willful and wanton misconduct shall be read into those provisions of the Tort Immunity Act that do not contain them. *Ries v. City of Chicago*, 242 Ill. 2d 205, 225 (2011). As a result, Plaintiff's claim that Officer Contreras' actions as a CCSPD officer were "negligent" when he shot the decedent is absolutely barred by the Act. *See* 745 ILCS 10/2-202 ("A public employee is not liable for his

act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct.")

Moreover, Plaintiff's claims against Sheriff Dart for failure to "instruct, supervise, control and discipline" Officer Contreras is absolutely barred by the Act. (Plaintiff's Second Amended Complaint Dkt.17 pg.8-9). Pursuant to 745 ILCS 10/2-201 "[e]xcept as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." Sheriff Dart and the CCSPD's act of instructing, supervising, controlling or disciplining Officer Contreras's is a discretionary decision for which a public employee and entity is immune from liability. 745 ILCS 10/2-201. Defendant Sheriff Dart is a public employee serving in a position involving the determination of policy or the exercise of discretion and therefore is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even if abused. 745 ILCS 10/2-201.

**B.    Plaintiff's State law claims must fail because there is absolutely no evidence of willful and wanton conduct.**

Plaintiff State law claims must also fail because the record is *devoid of any* evidence that Officer Contreras showed willful and wanton disregard for Plaintiff's safety. A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct. *See* 745 ILCS 10/2-202.  Officer Contreras' actions will only be considered willful and wanton conduct if he showed "an actual or deliberate intention to cause harm or which, if not intentional, show[ed] an utter indifference to or conscious disregard for the safety" of Plaintiff. *See* 745 ILCS 10/1-210. If anything, Officer Contreras, his fellow officers, and the Sheriff's Office showed a *tremendous* regard for Plaintiff's safety as evidenced by

preventing his two prior suicide attempts; by verbally engaging Plaintiff for one and a half hours after he threatened to kill the officers and attempted to stab them with a sword; and by placing their own lives at risk in attempting to subdue Plaintiff by non-lethal means despite his intent to harm or kill them. As a result, Plaintiff has failed to provide any evidence that Officer Contreras showed "an utter indifference to or conscious disregard" for his safety. *See* 745 ILCS 10/1-210.

## **CONCLUSION**

WHEREFORE Defendants, Sheriff Thomas Dart, Cook County and Officer Gary Contreras, for all of the foregoing reasons, respectfully request that this Honorable Court grant Defendants' Motion for Summary Judgment in its entirety.

Respectfully Submitted,
ANITA ALVAREZ
State's Attorney of Cook County

*/s/ Michael L. Gallagher*
Michael L. Gallagher
Assistant State's Attorney
500 Richard J. Daley Center
Chicago, IL 60602
(312) 603-3124