UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TRISHA HINOJOSA, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 13 CV 9079 |
| | ) | |
| vs. | ) | Honorable Judge Joan H. Lefkow |
| | ) | |
| SHERIFF OF COOK COUNTY, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Comes Now Plaintiff, Trisha Hinojosa, Individually and as Special Administrator and Special Representative of the Estate of Arturas Kolgovas, Deceased, by and through their attorney, The Law Office of Geoffrey G. Johnson, and in Response to Defendants' Motion For Summary Judgment state as follows:

## PREFATORY REMARKS

Plaintiff, Trisha Hinojosa, has filed her Second Amended Complaint against Defendants setting forth seven Counts. (Ex. 23) Count I is an Illinois State law claim for Wrongul Death against all Defendants, alleging willful and wanton conduct on their part; Count II is an Illinois State law claim against all Defendants for a Survival action, alleging willful and wanton conduct on their part; Count III is an Illinois State law claim for funeral expenses; Count IV is an Illinois State law negligence claim against the Sheriff of Cook County for negligent conduct; Count V is an Illinois State law negligence action against the Sheriff of Cook County for medical expenses, pain and suffering and loss of a normal life (survivorship); Count VI is an Illinois State law negligence claim against the Sheriff of Cook County for funeral expenses, and Count VII is a claim against Defendants Contreras and the Sheriff of Cook County alleging Fourth, Fifth and Fourteenth Amendment violations of the U.S. Constitution protected by 42 U.S.C. Sec. 1983.

The 1983 action against Defendant Contreras in this motion must be analyzed in a limited test: the objective reasonableness of Defendant Contreras' actions solely based on circumstances and information known to him at the time he killed Arturas Kolgovas. In addition, a local entity is to be judged on whether it caused a deprivation of constitution rights by its own policy or custom, which can be shown by improper or lack of training.

Plaintiffs have objected to a majority of Defendants' Statement of Facts as they deal with matters occurring years before the incident, matters involving other officers, matters subsequently discovered during the course of an Illinois State Police (ISP) investigation and matters where there is no showing that Defendant Contreras had knowledge of same at the time he pulled the trigger. Accordingly, these alleged facts can not be considered in deciding this motion.

Defendants also attempt to taint the waters from the start by making allegations completely unsupported by the facts. As examples, in Defendants Introduction, they allege Plaintiff had numerous prior arrests, had a history of fighting the police and may be in possession of a firearm. In reality, the numerous arrests amounted to four in his lifetime (for traffic violations, a drug charge, an assault and a domestic battery) with no convictions (56.1 (a) No. 36); The history of fighting the police in no manner involves anything physical whatsoever, only that he doesn't like authority figures (56.1 (a), response to No. 10); and the allegation he may be in possession of a firearm is in reality a comment from dispatch that "[h]e got a revoked FOID card, revoked FOID card", and a radio exchange between officer Rivlin and officer Macugowski (of which Defendant Contreras was not involved) that Mr. Kolgovas' daughter said her father had a friend who had a gun and does not know what happened with it. (56.1 (a) No. 36, 39) What the facts really show is we have an intoxicated individual who is having a bad day and talking irrational, an officer (Rivlin) that properly sets forth a plan to subdue the individual by

2

using a non-lethal method by means of a Taser, and a Defendant, who has no training regarding Tasers and how they work, who instantly shoots and kills Mr. Kolgovas before the non-lethal Taser method subdues him. The facts will clearly show numerous inconsistencies in Defendants' arguments which raise genuine issues of material facts requiring resolution of this case by a Jury on both the Federal and State actions.

## FACTS

On January 24, 2010 Arturas Kolgovas lived at the top of the stairs on the third floor of a building. His apartment was the first one on the left at the top of the stairs. There are six stairs that go from the landing between the second and third floor. (Ex. 20, No. 1, 2) Defendant Conteras arrived at the scene at approximately 17:00:58 hours. (Ex. 4, pg. 4 of 7) Mr. Kolgovas was intoxicated, obviously disturbed, and had told the police that in his mind he believed the officers were there to rob him but that he felt compelled to defend his house. (56.1(a), No. 26) Right before the shooting, there were five officers positioned in the stairway leading up to Mr. Kolgovas' apartment; officers Eastman and Cholewinski of the Glenview Police Department, who were positioned on the landing between the second and third floors, officers Valdez and Rivlin of CCSPD who were on the steps leading to Mr. Kolgovas' apartment, and Defendant Contreras of CCSPD who was on the stairs between the second floor and the landing between the second and third floor. (56.1(a) No. 62, 63, 64, Ex. 20, 1, 2) Of the five officers, only two, Rivlin and Contreras, were members of the CCSPD Hostage Barricade Team (HBT). (56.1(b), No. 96) The Glenview officers provided officers Valdez and Rivlin with a ballistic shield, which officer Valdez was holding in front of him with his left foot on the sixth stair and his right foot on the fifth on the stairs leading from the landing to the 3rd floor. Officer Rivlin was behind him to his right, (56.1(b), No. 85; Ex. 19) Prior to this, the CCSPD command center informed the officers the HBT was notified and ordered the officers to

create a staging area, gather intelligence and that a Ballistics vehicle and team were on the way. (56.1 (a), No. 51, 52, 53) Officer Rivlin wore a Level III Molle ballistic vest which had a ceramic or ¼" steel plate in it which would stop handgun bullets, rifle bullets and an edged weapon. (56.1(a), No. 75 response) The ballistic shield officer Valdez held in front of himself and officer Rivlin was adequate protection from either a firearm round or sword. (56.1(b), No. 99; Ex. 19)

Officer Rivlin devised a plan to take Mr. Kolgovas into custody. He assigned himself to "go taser", which meant that he would use less than lethal force to restrain Mr. Kolgovas, and Defendant Contreras was assigned lethal cover, which meant if the non-lethal force was ineffective, Defendant Contreras could use deadly force if needed to stop a threat of bodily harm to another. (56.1(b), No. 98; 56.1(a), No. 60, 61)

A Taser is a non-lethal weapon which fires two probes attached to wires. The top probe goes approximately where one aims and the bottom probe goes downward and to the right. An electrical charge goes through these wires. When the probes make contact with one's body, either by penetrating the skin or being in one's clothing within a combined 2" of clothing near the skin and arching, a connection is made. The electrical charge disrupts one's central nervous system, or motor functioning of the body. The muscles are contracted, overrides the brain and incapacitates the person. Because of the way a Taser works, whether a person is under the influence of alcohol or not makes no difference. Once Tasered a person is incapacitated almost immediately by the muscle contracture and then collapses. It is not uncommon that when Tasered the muscle contractures causes the Tased person to first bend forward. (56.1(b), No. 83, 101)

Defendant Contreras never received any training on Tasers or attended any classes involving Tasers. (56.1(b), No. 95) Officers receive no training whatsoever involving situations involving the use of deadly force where a Taser has also been

involved, or what reaction can be expected by someone Tased before a decision to use deadly force is made, or that when a person is Tased an officer should wait for the Taser reaction before using deadly force. (56.1(b), No. 104) No training is given officers regarding situations involving use of deadly force in those situations. (56.1(b), No. 105)

While the officers were positioned on the stairs, Mr. Kolgovas opened his door and stepped into the doorway in the door frames with the sword in his hand pointed straight down. (56.1(b), No. 86, 87) Officer Rivlin reached around the ballistic shield with his right hand. His legs and body were behind the shield. Officer Rivlin fired his Taser at Mr. Kolgovas, aiming for the middle of his chest, and took full cover behind the shield. (56.1(b), No. 88) At the time he fired his Taser, the tip of the sword, which had been pointed straight down had started to come off the floor but not toward officer Rivlin. (56.1(b), No. 87) At the time officer Rivlin fired his Taser, inexplicably Defendant Contreras simultaneously fired his rifle, an M4 rifle with bullets designed to explode upon impact, and shot Mr. Kolgovas. (56.1(b), No. 89) After being shot, Mr. Kolgovas fell back into his apartment. (56.1(b), No. 86)

At the time Mr. Kolgovas was shot, officer Rivlin's Taser had deployed, the wire went directly to Mr. Kolgovas. Mr. Kolgovas had been Tasered and the probes were in Mr. Kolgovas. The reports from the CCSPD submitted to the Medical examiner admitted that Mr. Kolgovas had been Tasered and shot. (56.1(a), No. 78 Response; 56.1(b), No. 91)

When Mr. Kolgovas was Tasered and shot, there was nothing which prevented officers Valdez and Rivlin from being able to effectively Taser Mr. Kolgovas had they been halfway up the stairway rather than higher up. This would have been in compliance with the CCSPD Special Order OPS 01-27-E, requiring officers to not needlessly endanger themselves to conform with the contents of use of force orders. (56.1(b), No.

93; Ex. 21) Furthermore, nothing prevented officer Rivlin or officer Valdez from backing down the stairs. (56.1(b), No. 92)

Mr. Kolgovas was alive when the paramedics transported him to the hospital and died several hours later at 9:00 p.m. (56.1(b), No. 94)

The CCSPD General and Special Orders state that use of a firearm in any case is a last resort, and used only after other reasonable means at their disposal to effect apprehension and control of an individual have been attempted without success. (Ex. 21; Ex. 22; 56.1(b), No. 107)

Afterward, the autopsy of Mr. Kogovas was assigned to Cook County Medical Examiner, Dr. James Filkins. The report received by the Cook County Medical Examiner's office stated the matter involved an individual who was Tasered and shot by police. Dr. Filkins, who was assigned the case involving a Taser deployment and police shooting by Cook County's office, had never done an autopsy or exam on anyone who had been Tasered. This is the only autopsy he has performed for the M.E. Office which involved a Taser or Taser probe. Dr. Filkins has never before seen a body that had been penetrated by a Taser dart or probe. Nonetheless, after examining Mr. Kolgovas' clothing he found Taser marks and probe tip in and sticking through Mr. Kolgovas' jacket. When checking those marks with the body he found matching areas of marks that could be probe marks. He found no other such marks on the body. He then took photos pointing to the matching probe marks, along with photos of the probe. (56.1(b), No. 82; Ex. 20, No. 8, 9 and 10)

Dr. Filkins also stated that the concentric nature of the Rifle bullet wound can be explained if Mr. Kolgovas was falling forward or down after being Tasered when the person below, Defendant Contreras, shot him. (56.1(b), No. 81)

Sergeant Richard O'Brien is a member of the HBT and instructor of the HBT members. He stated that no instruction or demonstrations are given to non-certified Taser users on Taser use and what happens when one is Tasered; there is no course that discusses what will happen if an edged weapon strikes a ballistic shield; that HBT members are taught that should they encounter a person that's intoxicated or seems to act irrational or displays suicidal tendencies, a HBT negotiator should be called in, of which HBT had 14 in 2010. Neither officers Rivlin nor Contreras were negotiators. (56.1(b), No. 100, 101)

Officer Brian Hartsfield trains new police officers and retrains current officers for the CCSPD on use of deadly force. He stated there is no training given officers involving the use of deadly force when a Taser has also been involved; there is no training or instruction on use of force for situations involving stairways and deploying a Taser followed by deadly force. Officers receive no specific training on use of force when an intoxicated person is involved; officers are given no training on the use of deadly force against people who might have a temporary mental incapacitation. (56.1(b), No. 104, 105, 106) He agrees that the fact Mr. Kolgovas was intoxicated and acting irrational was something the shooting officer should have taken into consideration, especially since an intoxicated person can not walk, move or act as well. However, this is not taught the officers of the CCSPD. (56.1(b), No. 109, 110)

According to officer Brian Hartsfield, who teaches use of force to CCSPD officers, in this matter the fact of Mr. Kolgovas simply opened his door and was simply standing in his doorway with a sword in his hand justifies a CCSPD officer to shoot him. (56.1(b), No. 108)

# ARGUMENT

I

## 1983 CLAIM AGAINST GARY CONTRERAS

It is well established that claims against police officers involving use of excessive force, deadly or not, are analyzed under the Fourth Amendment's objective reasonableness standard. <u>Graham v. Connor</u>, 490 U.S. 386 (1989). The question is whether an officer's actions are objectively reasonable in light of the facts confronting him. Id at 397. Further, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight." Id at 396. Thus, information found later, such as the information Defendants rely on which was found by the Illinois State Police during their five month investigation after the shooting, can not be considered in determining whether Defendant Contreras' actions were objectively reasonable. As stated in <u>Sherrod v. Berry</u>, 856 F. 2d 802, 805 (7th Cir., 1988):

> Knowledge of facts and circumstances gained after the fact… has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment. Were the rule otherwise, … the jury would possess more information than the officer possessed when he made the crucial decision. Thus, we are convinced that the objective reasonableness standard articulated in *Lester* requires that [an officer's] liability be determined exclusively upon an examination and weighing of the information [the officer] possessed immediately prior to and at the very moment he fired the fatal shot. The reception of evidence or any information beyond that which [the officer] had and reasonably believed at the time he fired his revolver is improper, irrelevant and prejudicial to the determination of whether [the officer] acted reasonably "under the circumstances."

The <u>Sherrod</u> Court, relying on <u>Lester v. City of Chicago</u>, 830 F. 2d 706, stated the Fourth Amendment test measures the objective reasonableness of an officer's actions under the circumstances known and information available to the officer at the time he fired the fatal shot. <u>Sherrod</u> Id at page 804.

In addition to information obtained after the time of the shooting being improper, the court in <u>Palmquist v. Selvik</u>, 111 F. 3d 1332, (7th Cir., 1997), went beyond information gained after the fact to include past actions, mental state and physical behavior before an incident. The <u>Palmquist</u> Court citing <u>Wallace v. Mulholland</u>, 957 F. 2d 333 (7th Cir. 1992) and <u>Rascon v. Hardiman</u>, 803 F. 2d 269 (7th Cir., 1986), stated that evidence of a Plaintiff's prior mental health, including a suicide attempt, and evidence of the likelihood such a person would act aggressively is inadmissible as it would shift the focus from Plaintiff's actions at the scene to his condition. This would allow juries to base decisions on prior actions or conditions rather than what happened at the scene. Thus, "evidence relating to the plaintiff's mental and emotional state and past actions is not admissible in judging the use of excessive force." <u>Palmquist</u>, Id. at 1340.

It is obvious, that all of Defendants extensive allegations regarding past acts by Mr. Kolgovas, and all information that was discovered or became known after the shooting is irrelevant to deciding the issue of Defendant Contreras' reasonableness in his use of deadly force.

Defendants Brief is replete with comments and allegations not supported and not germane to Contreras' reasonableness. Examples begin right at the start of Defendant's argument with statements that Plaintiff had prior suicide attempts, a criminal record which included "fighting police", and Contreras knew Plaintiff was extremely dangerous. None of this is relevant and also not supported by facts. Any prior suicide attempt was not known to Contreras and is not admissible. The Plaintiff's criminal record is puzzling in that the facts show that in his lifetime Mr. Kolgovas had four arrests and not one conviction. This again is not admissible. As to the "fighting police", the facts specifically show that had nothing to do with anything physical whatsoever and simply meant he

backed away from authority figures (56.1(a), Response to 10). There is nothing to establish that Contreras had any basis to define Plaintiff as extremely dangerous.

What the facts show is that Contreras arrived about 5:00 p.m., long after all the activities involving the other officers with door openings and such had already taken place outside his presence. He was briefed about Mr. Kolgovas being inside and having a sword and verbally threatening officers. It was obvious Mr. Kolgovas was intoxicated and acting irrational, having indicated he believed the officers were there to rob him and how he had to defend his home. Contrary to what Contreras as a member of HBT was taught to do when an intoxicated person or one who acts irrationally is involved, no HBT negotiator was called in by him or even suggested.

Officer Rivlin properly devised a plan to use non-lethal force to subdue Kolgovas, as is required by CCSPD Special and General Orders. In this plan, Contreras allowed himself to have the assignment to use deadly force, knowing a Taser was going to be used and that he had no training whatsoever regarding Tasers and had no idea what reaction Mr. Kolgovas would have when Tasered and what to expect. Contreras' allegations that ballistic vests will not stop an edged weapon, while true, fails to state the relevant truth, that being that the ballistic vests the HBT members (which includes Rivlin) wear have plates which do stop an edged weapon. Contreras' allegation the ballistic shield was not designed to repel an edged weapon is contradicted by officer Valdez. Officer Valdez was the CCSPD officer holding the ballistic shield in front of himself and officer Rivlin when Kolgovas was Tased, who said that after Kolgovas was Tased he entered the Kolgovas apartment behind the shield, which can stop a bullet and sword.

Conteras alleges his use of deadly force was reasonable and justified since he saw the sword coming up which jeopardized Rivlin. If this is his justification, then one must

without question consider Rivlin's testimony that as the sword came up, it was not coming up toward him. Rivlin also stated that when the sword began to lift from a straight down position Kolgovas had been Tasered. After being Tasered, Kolgovas had undoubtedly bent over with muscle contractions, which could have caused the sword to rise, which Contreras obviously misinterpreted since he had no Taser knowledge or training. The most egregious mistake, error and unreasonable act Contreras made was shooting Kolgovas right at the time Rivlin deployed the Taser. Contreras never allowed Kolgovas to be apprehended with the non-lethal force Rivlin directed when he set up the situation to Taser Kolgovas. Contreras never gave Kolgovas a chance. The actions of Kolgovas when he was Tasered, which would emulate actions of someone going forward after Tased were used by Contreras to kill him rather than the Taser being sued to subdue him. Almost everything alleged by Contreras to justify his actions have contradictory evidence and/or facts or logical contrary explanations which raise numerous issues of fact regarding his reasonableness in shooting Kolgovas.

Defendants rely heavily on *DeLuna v. City of Rockford* alleging similarity to what Contreras faced. Nothing could be more opposite. The officer who shot the victim had responded to a call about a week before involving the victim. The victim was known to be very violent, with an extensive arrest history, was known to both carry guns and to sell guns, kept chasing after the officer outside and then lunged at him so the officer shot in self defense. Obviously, the facts in the matter at issue are very different.

Defendant Contreras' testimony regarding what he says was his perception of what he observed must be judged in light of the facts. He alleges he felt officer Rivlin was in jeopardy because of the sword, which he saw begin to raise. He alleges the distance between Kolgovas and Rivlin was 2-3 feet. First, the facts show Rivlin was behind officer Valdez and the ballistic shield, so he was on either the 4th or 5th stair. One

can look at the photos and realize the distance from Kolgovas' doorway to that stair is far greater than 2-3 feet. Further, officer Rivlin at any time could have backed down the stairs had he felt he was in jeopardy.

As the CCSPD use of force instructor, Hartsfield testified that a person who is intoxicated can not walk, move, or act as well. Obviously this was something Contreras knew and could observe and should realize that even if Kolgovas was to sway and stumble forward out of his doorway, he was not about to chase the officers down the stairway even had he not been Tasered. The use of force instructor Hartsfield even admitted that Contreras, the shooting officer, should have taken the fact of Kolgovas' intoxication and acting irrationally into consideration, which he did not do. Finally, why did the two HBT officers on scene at the time not call for a negotiator as required, or simply go down the stairs and wait for the other members of the HBT to arrive (they came after Kolgovas was shot). Mr. Kolgovas repeatedly told them he just wanted to be left alone and they kept pushing him to come out. All these facts and unanswered questions must be considered when looking at and deciding the objective reasonableness of Defendant Contreras' actions.

There can be little doubt that there are so many issues and conflicting facts in this matter that raise issues as to the objective reasonableness of Contreras' actions under the circumstances, the final determination must be made by a jury.

**II**

**1983 CLAIM AGAINST SHERIFF OF COOK COUNTY AND COOK COUNTY**

An entity may be held liable under 1983 for constitutional violations caused by the entity itself through its own policy or custom. <u>Monell v. New York</u>, 436 U.S. 658 (1978). Inadequacy of police training is also a basis for an entity's 1983 liability when it

amounts to deliberate indifference to peoples' rights. <u>Canton v. Harris</u>, 489 U.S. 378 (1989). What one must analyze is whether the failure to train has brought about a Constitution wrong upon people the police come into contact with. In some cases, the need for training is so obvious, and the inadequacy so likely to result in a violation of Constitutional rights the entity can be said to be deliberately indifferent to the need to train, and the failure to train can be said to be a policy for which it is responsible and liable if it causes an injury. Id. at 390. See also <u>Jenkins v. Bartless</u>, 487 F. 3d 482 (7th Cir., 2007) In such a case of obvious need for training, the Sheriff and Cook County can be liable under 1983 for improper training or improper procedure in an officer related incident, even if the officer charged with violating one's constitutional rights is exonerated. <u>Fairly v. Luman</u>, 281 F. 3d 913, (9th Cir., 2002).

Thus, Defendants citing <u>Connick</u> for the proposition that there must be a pattern of similar constitutional violations by untrained employees to establish deliberate indifference is misplaced. In that case, the court found that the need to train was not so obvious to impose liability.

In this case the Sheriff's office, an arm of Cook County, provided no training to its officers as to when to use or not use deadly force when a Taser is also involved, provides no training to its officers on use of deadly force against people who are intoxicated or have a temporary mental incapacitation. The Sheriff's officer that trains officers on use of force admits that the fact Mr. Kolgovas was intoxicated and acted irrational should have been taken into consideration before the officer used deadly force, however this is not taught the officers of the CCSPD. In addition, when members of the HBT of the CCSPD are trained, there is no training given non-certified Taser users on Taser use and what happens when one is Tasered. There is also no training regarding edged weapons and their effect on Ballistic Shields.

The failure to train its officers and HBT members in these areas puts their officers in a position that when faced with a scenario as occurred here, it is foreseeable the result will be that someone will get injured and the use of deadly force may be unjustifiably used. That officers can be put in a situation such as occurred here is absolutely foreseeable, and with no training regarding the issues involved shows a deliberate indifference to someone's Constitutional rights in such a situation since there is definitely a risk someone may be injured and be deprived of 4th, 5th and 14th Amendment rights. Here, the need to train its officers regarding the issues and situations that confronted the CCSPD, HBT, and Mr. Kolgovas, is so obvious that such inadequacy in the Sheriff's training program is so likely to result in someone's Constitutional rights being violated that this failure to train may be considered to be a policy which results in liability if it causes an injury. There can be no doubt, the failure to train the CCSPD officers in this matter directly resulted in actions, inactions and poor decisions being made regarding use of deadly force, which was a deliberate indifference to peoples' rights which brought about a Constitutional wrong.

In addition, one can even hold the Sheriff's Office liable through its own policy and custom. Here, the Instructors of officers for the Sheriff's Department teach their officers their policy. Officer Hartsfield, the Sheriff's use of force Instructor acknowledged that it is the Sheriff's policy that when an officer encounters a situation where someone has had too much to drink, is talking irrationally and possesses an edged weapon in his hand, and is inside his home, that if that person opens his door and stands there, shoot him. (56.1(b) No. 108) Which Contreras did. It is hard to believe how a policy can be more egregious, and ripe for Constitutional violations to result.

**III**

# STATE ACTIONS AGAINST ALL DEFENDANTS

Defendant agrees that under the Illinois Tort Immunity Act, Defendant Contreras can be liable if his acts or omissions in this matter constitute willful and wanton conduct. (pages 14-15 of Defendants' Brief; Also 745 ILCS 10/2-202) Defendant then argues that as a result, Plaintiff's negligence claims alleged against Contreras are barred by the Act. There are no negligence claims against Contreras. Counts I, II and III against Contreras all allege acts or omissions which amounted to willful and wanton conduct. (Ex. 23, Second Amended Complaint) The allegations against the Sheriff and Cook County in the first three counts are based on agency and employer-employee relationships.

Unlike the 1983 action, under State law, the employer is liable for the employee's actions in this matter.

The Illinois Pattern Jury Instructions define Willful and Wanton Conduct as follows: When I use the expression "willful and wanton conduct" I mean a course of action which shows actual or deliberate intention to harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others. (I.P.I. 14.01) The Act does not require willful and wanton conduct to be an intentional act. It can also be an act committed under circumstances exhibiting a reckless disregard for the safety of others. *Medina v. City of Chicago*, 238 Ill. App. 3d 385, 606 N.E. 2d 490 (1st Dist. 1992).

There is no dispute in this matter regarding the fact Defendant Contreras intended to pull the trigger on his rifle and shoot Arturas Kolgovas. There is no dispute that Defendant Contreras intended to use deadly force against Mr. Kolgovas. The facts also show Defendant Contreras ignored the attempted use of non-lethal force, the Taser, before he shot Mr. Kolgovas. The facts show that when the trigger was pulled, it was

15

done so in violation of the Sheriff Department's own Special and General Orders (Ex. 21, 22), which forbids the use of firearms until all other reasonable means (as the Taser) have been attempted without success. Officer Rivlin's success in using non-lethal force by Tasering Mr. Kolgovas was never able to reach fruition since Defendant Contreras shot him instead. As officer Rivlin pulled the trigger on his Taser, Defendant Contreras was pulling the trigger on his rifle. Without repeating all the facts set forth in "FACTS" above, it is apparent there are more than sufficient facts through the Sheriff's Department and its officers, through their acts and omissions, to show willful and wanton conduct on behalf of Defendant Contreras, individually and as agent of Cook County Sherriff's Department, and thus on them also. In addition, the least that can be said is there are numerous issues involving conflicting testimony raising genuine issues of material fact. Furthermore, "[w]hether conduct is "willful and wanton" is ultimately a question of fact for the jury. <u>Doe v. Calumet City</u>, 161 Ill. 2d 374, 390, 641 N.E. 2d 498, 506 (Illinois Supreme Court 1994)

IV

### STATE ACTIONS AGAINST COOK COUNTY AND ITS SHERIFF SOUNDING IN NEGLIGENCE MUST STAND

The allegations against the Sheriff do not deal with the exercise of discretion or on determining policy. Their negligence does not involve their not having a policy. The allegations of negligence involve the Sheriff's Officer not carrying out the policies as set forth in the CCSPD ORDERS (Ex. 21 and 22) and allowing officers like Defendant Contreras to be assigned to use deadly force when he had no idea what to expect or how to Act under the scenario he was presented with involving Mr. Kolgovas. The Sheriff Department determined policy in their ORDERS to reduce the likelihood that someone

would be hurt or killed. The Sheriff's Department then turned its back and let Defendant Contreras act without proper training and supervision.

Here again, the facts require these issues be resolved by a jury.

## **CONCLUSION**

The facts set forth in the parties 56.19a) and 56.1(b) submissions, and memorandums, clearly show that the facts in this matter are far from being totally clear, that many contentions made by Defendant Contreras are disputed, contradicted and proven not correct, and that numerous significant facts are unclear and contain contradictory testimony. The 42 U.S.C. 1983 action contains a plethora of genuine issues of significant and material facts in order to determine Defendant Contreras' reasonableness in his actions, and the Cook County Sheriff creating a constitution deprivation of rights, not only caused by its own policy or custom, but also by its failure to train, which must go to a jury for resolution. Also, without question, the State of Illinois causes of action must also be presented to a jury for resolution of the issues of fact.

Respectfully submitted,

/s/    Geoffrey G. Johnson
    Geoffrey G. Johnson

Geoffrey G. Johnson
LAW OFFICE OF GEOFFREY G. JOHNSON
20 North Clark Street
Suite 3100
Chicago, IL 60602
(312) 263-6969