| | | |
|---|---|---|
| **TRISHA HINOJOSA, et. al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 13 CV 9079** |
| | ) | |
| **vs.** | ) | **Honorable Judge Joan H. Lefkow** |
| | ) | |
| **SHERIFF OF COOK COUNTY, et. al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' LOCAL RULE 56.1(a) STATEMENT OF FACTS AND PLAINTIFFS' LOCAL RULE 56.1(b) ADDITIONAL FACTS

NOW COME Plaintiff, Trisha Hinojosa, by and through her attorney, Law Office of Geoffrey G. Johnson, and hereby submits her Response to Defendants' Rule 56.1(a) Statement of Facts and in support thereof, Plaintiff states the following:

### Plaintiff's History with CCSPD

1. On April 24, 2008, Cook County Sheriff's Police Department ("CCSPD") officers responded to a Cook County Dispatch advisory of a "check for wellbeing" at Plaintiff Arturas apartment located at 3221 W. Parkway Drive, Northbrook, Illinois. (Exhibit I, Cook County Sheriff's Police Department Reports, pg.l). CCSP Officers Fullman and Johnson along with Sgt. Collins attempted to gain entry repeatedly, and were eventually let in by the building maintenance person. (Exh. I, CCSPD Rpt. pg.l-2).

**None of this is relevant to any issue regarding this summary judgment motion, as evidence outside the time frame of the shooting or not known or considered by Defendant Contreras at the time he pulled the trigger is not relevant, is prejudicial, and does not determine the objective reasonableness of Defendant Contreras' conduct at the moment he shot Mr. Kolgovas. _Palmquist v. Selvik_, 111 F. 3d 1332 (7th Cir., 1988), _Sherrod v. Berry_, 856 F. 2d 802 (7th Cir., 1988)**

2. Plaintiff had informed his friend, Troy Smith, that he was "going to harm" himself. (Exh. I, CCSPD Rpt. pg. 2).

**See 1.**

3.      Upon entry, officers discovered Plaintiff lying on his couch and several notes were found nearby indicating that Plaintiff intended to harm himself. (Exh. I, CCSPD Rpt. pg. 2-3, 8-15).

**See 1.**

4.      Plaintiff was transported via ambulance to the hospital where he was involuntarily admitted for care. (Exh. 1, CCSPD Rpt. pg.2).

**See 1.**

5.      On January 4, 2009, CCSPD officers once again responded to Plaintiff's Northfield residence because he was suicidal and "wanted to drink himself to death." (Exh. 1, CCSPD Rpt. pg.16).

**See 1.**

6.      Upon arrival, Plaintiff's girlfriend at the time (later identified as Trisha Hinojosa wife of the deceased) informed police that Plaintiff had "been drinking for the past two and a half weeks and that he had a friend who drank himself to death and that is what he was going to do." (Exh. 1, CCSPD Rpt. pg.16).

**See 1.**

7.      Glenview Fire responded to the scene and transported Plaintiff to Glenbrook Hospital ER for treatment. (Exh. I, CCSPD Rpt. pg.16-17).

**See 1.**

<strong>911 Call and Radio Dispatch</strong>

8.      On January 24, 2010, at approximately 4:00p.m., CCSPD 911 Dispatch received a domestic disturbance call from Plaintiff's apartment complex located at 3221 W. Parkway Drive, Northbrook, Illinois. (Exhibit 2, CCSPD Dispatch call log at pg.l; Exhibit 3 CCSPD Dispatch audio diskette "track" I).

**Admit but not relevant.**

9.      The girl (later identified as Eve Kolgovaite, DOB 06/11/70, daughter of deceased) was upset, crying, and stated "can you come out here please" before abruptly hanging up the phone. (Exh.

3, CCSPD Dispatch audio diskette "track" I; Exh. 4, CCSPD Dispatch transcript Vol. 1 pg. 2:4). When the dispatcher attempted to call back, there was no answer. (ISP Investigative Summary, 0021; Exh. 3 CCSPD Dispatch audio diskette "track" 2 at 01:20; Exh. 4, CCSPD Dispatch transcript Vol. I pg.2: 1-19).

**Admit the Exhibit says "can you come out here please" but can not find any confirmation of the other facts in the referred to Exhibits, and is not significant to the motion.**

10.     At approximately 4:00 p.m., the CCSPD 911 Dispatcher made a department-wide radio call for a "wellbeing" check and  stated the following:

> "Previous incident was for suicidal male subject. It was Eve's father." "There was  a caution in the previous CR indicating that he will fight police." (Exh. 3  CCSPD Dispatch audio diskette "track" 1, track 3 at 01:38-02:50; Exh. 4 CCSPD Dispatch transcript Vol. I pg.4:9-13, 5:3-19; Exhibit 7, CCSPD  Officer Macugowski  Dep. pg.44: 17-24,45:1-18).

**See 1. Also, the words "he will fight police" should include the definition from officer Macugowski's deposition, in the pages referred to (pg. 45, Ln. 1-11), that this does not mean he gets into fisticuffs or anything physical; only he does not like authority figures.**

11. Eve later told Illinois State Police ("ISP") investigators  that  for  the  past  six months Plaintiff had been going on "drinking binges" and have become violent. (Exh. 5, ISP Investigative Summary at pg.0021; Exh. 7, Off. Macugowski Dep. pg.69:4-21).

**See 1. Also, this involves information obtained in an investigation of the incident conducted by the Illinois State Police done after the shooting from January 24, 2010 to July 1, 2010.**

12.     When Plaintiff went on drinking binges, his wife Trisha Hinojosa, did not allow him to live with her, which is why Plaintiff was staying at 3221 Parkway Blvd. at the time of the incident. (Exh. 5, ISP Investigative Summary at pg. 0032).

**See 11.**

13.     On the night of the incident, Plaintiff was drunk and yelling at Eve that he wanted her to get him more alcohol. (Exh. 6, CCSPD Officer Prohaska Dep. pg.12:18-20; Exh. 7, Off. Macugowski Dep. pg.69:4-21). Eve refused and Plaintiff began screaming and acting irrational. (Exh. 6, Prohaska Dep. pg.l2:20-22).

**See 1. In addition, this was not information given to Defendant Contreras.**

14.     When Eve refused, Plaintiff threw full beer cans at her and struck her in the back. (Exh. 5, ISP Investigative Summary at pg.0021, 0032; Exh. 7, Off. Macugowski Dep. pg.69:4- 21). Eve ran from the living room and locked herself inside the bedroom while she called 911. (Exh. 5, ISP Investigative Summary pg. 32).

**See 11.**

15.     At that time, Plaintiff began punching and  kicking  at the bedroom  door. *Id.;* Exhibit 13, ISP Scene photographs disk 2, IMG_300-310_JPG).  Plaintiff then  forcefully opened· the bedroom door and threw  more beer cans at Eve before yelling "it's time for you to let me go." (Exh. 5, ISP Investigative Summary pg.0021, 0032; Exhibit 13, ISP Scene photographs disk 2, IMG_300-310, 328-331_JPG).

**Admit the Illinois State Police scene photographs, but deny the relevancy of the rest (See 11).**

16.     Eve believed that her father was "really going to hurt [her]", so she ran back to the living room and then downstairs and out of the condo building. *Id.* at 0021. As she ran outside, she was greeted by CCSPD officers. *Id.* at 0021.

**See 1.**

### CCSPD Initial Encounter with Plaintiff

17.     CCSPD Officers Ronald Prohaska and Henry Macugowski were the first officers to respond to the scene. (Exh. 6, Off. Prohaska Dep. pg.7:12-23, Exh. 7, Off. Macugowski Dep. pg.l5-16).

**See 1.**

18.     Upon arrival, the Officers observed Eve standing in the apartment building vestibule and she appeared scared, distraught, and was crying. (Exh. 7, Off. Macugowski Dep. pg.71:5-15).

**See 1.**

19.     Officer Macugowski asked Eve "what were the circumstances that she felt the need to call 911?  Exh. 7, Off. Macugowski Dep. pg.69: 1-6). Eve responded with the following:

"She said that she was with her dad. The reason she was with him is because she is his favorite

daughter from the first marriage because she is the only one that puts up with him when he drinks. She had been with him for a week. Allegedly, he ha[d] been drinking cognac and beer the whole week. When he spilled his beer and he told her to go get another one, that is when the whole domestic argument started where he started throwing objects at her - beer cans, her purse - calling her a whore because she has a child but she has never been married. When she got scared from him chasing her and throwing everything at her, that is when she ran out and gave us a call." (Exh. 7, Off. Macugowski Dep. pg.69:4-22).

**See 1. In addition, officer Macugowski had left the area where Mr. Kolgovas was shot to secure Eve in his vehicle at the time of the shooting. Ex. 7, Macugowski dep., pg 53: 12-20.**

20.     The Officers and Eve then proceeded to Plaintiff's third floor apartment while Eve remained on the landing between the second and third floors. (Exh. 7, Off. Macugowski Dep. pg.l9-20; Exh. 13, ISP Scene photographs disk 1, IMG_219-221, 227-232_JPG).

**See 1.**

21.     The apartment complex has at least nine separate buildings. (Google Maps, last visited on February 5, 2015 https://www.google.com/maps/place/3221+W+Parkway+Dr+Northbrook, +IL+60062/@42.094 I 695,87.8757388, 193m/data=!3m I!I e3 !4m2!3m I!I s0x88 Ofb85e6972c9ef:Oxfb089af72al58e70).

**See 1.**

22.     Plaintiff's apartment was located in a three story building which contained four units on each of the three floors. (Exh. 4, CCSPD Dispatch transcript Vol. 1 pg.20:13-24, 21:1- 10; Exh. 13, ISP Scene photographs disk 1, IMG_227-232_JPG).). As pictures of the scene indicate, the front doors of the three other apartments on the third floor are all within eight feet of each other. (Exh. 13, ISP Scene photographs disk 2, IMG_300-310_JPG).

**Admit the ISP photos but do not find measurements to support the allegation.**

23.     The Officers knocked on Plaintiff's door, and in full uniform, announced their office. (Exh. 7, Off. Macugowski Dep. pg.IO:l-14, 20-21; Exh. 5, ISP Investigation  Summary pg.0029-0030).

**See 1.**

24.     Plaintiff partially opened the door approximately three to four inches. (Exh. 6, Off. Prohaska Dep. p.14:16, 18-20; 15:12). The apartment was dark inside so Officer Prohaska could only

see Plaintiffs face and bare chest. (Exh. 6, Off. Prohaska Dep. pg.16:3-13).

**See 1.**

25.     Officer Macugowski stated "[s]ir, you need to come out, open the door and speak to me to find out what is going on." (Exh. 7, Off. Macugowski Dep. pg.25: 1-10).

**See 1. Also does not involve the Defendant Contreras.**

26.     Plaintiff responded that he will not let the Officers "rob him" and that "it is his house" and he would "defend his house to the end." (Exh. 7, Off. Macugowski Dep. pg.28:9-16; ISP Investigation Summary pg.0030, Exh. 3, CCSPD Dispatch audio diskette "track" 3 at 04:54- 5:05; Exh. 4 CCSPD Dispatch transcript Vol. I pg.7:14-16).

**See 1. Also does not involve the Defendant Contreras.**

27.     Plaintiff then suddenly "thrust" a "large sword" towards Officers Prohaska and Macugowski. (Exh. 6, Off. Prohaska Dep. p.16:3-13; 17:10-13; 20:16-18; Exh. 7, Off. Macugowski Dep. pg.25:1-15, 27:7-19).

**See 1. Also does not involve the Defendant Contreras.**

28.     At the time, the Officers were only standing  an "arm's length"  away from the door and the blade came within a "couple inches from [their] body." (Exh. 6, Off. Prohaska Dep. pg.20:5-23, Exh. 7, Off. Macugowski Dep. pg.25:5-21, 28:1-3)

**See 1. Also does not involve the Defendant Contreras and officer Prohaska was contradicted by officer Macugowski who said officer Phohaska was behind him and off to the left, not at arms length to the door. Ex. 7, Macugowski dep., pg. 39: 1-8.**

29.     Plaintiff attempted to stab with the sword Officers two or three more times through the open door. (Exh. 6, Off. Prohaska Dep. pg.23:21-24; 24:1-3; Exh. 7, Off. Macugowski Dep. pg.25:1-15, 39:9-21).

**See 1. This was all before Defendant Contreras arrived.**

30.     Officer Prohaska stepped back away from the door, drew his weapon, and told Plaintiff to "drop it, get down!" (Exh. 6, Off. Prohaska Dep. pg.18:4-6). Plaintiff refused, and instead held onto the sword with both hands and stated "if someone is going to come in, they are going to die." (Exh. 6,

Off. Prohaska Dep. pg.20:6-8, 27:16-20; Exh. 7, Off. Macugowski Dep. pg.41:2-6).

**See 1. This was all before Defendant Contreras arrived.**

31.     In an effort to "deescalate" the situation, Officer Macugowski responded "[n]obody has to die. Just put down the sword because if you keep it up you are going to get sprayed" with oleoresin capsicum ("OC"). (Exh. 7, Off. Macugowski Dep. pg.33:2-12, 41:10- 13).

**See 1. Doesn't involve Defendant Contreras.**

32.     Officer Macugowksi realized the OC spray would have been "useless" considering Plaintiff was intoxicated, he was partially shielded by the door, and with "spray versus a samurai sword, obviously the sword is going to win." (Exh. 7, Off. Macugowski Dep. pg.32:1-16, 34:1-4).

**See 1. Doesn't involve Defendant Contreras.**

33.     Plaintiff then slammed the door shut before "engaging the deadbolt" lock. (Exh. 7, Off. Macugowski Dep. pg.41:14-23). Once again Officer Macugowski asked Plaintiff to exit the apartment without the sword but he did not respond. Exh. 7, Off. Macugowski Dep. pg.44:1- 6).

**See 1. Doesn't involve Defendant Contreras.**

34.      At approximately 4:09 p.m., Officer Macugowski radioed CCSPD Dispatch that the "[s]ubject's door is partially open. 36 has view of the subject holding a Samurai sword inside the apartment." (Exh. 3, CCSPD Dispatch audio diskette "track" 3 at 01:38-02:50; Exh. 4, CCSPD Dispatch transcript Vol. I pg.5:3-19).

**See 1.**

35.     The Officers then escorted Eve to their squad car and took up defensive positions in the hallway as they waited for additional officers to arrive. (Exh. 5, ISP Investigative Summary, pg.OOI4).

**See 1. Also, exhibit reference does not support allegation.**

36.     At approximately 4:14 p.m., the dispatcher provided additional information over the radio:

> "He's got a revoked FOlD card, revoked FOID card. Positive response on his CQH ["Criminal Questionable History"]. It's going to be a total of four arrests: six charges, no conviction, for traffic; one charge, no conviction, dangerous drugs; one charge, no conviction, for assault; last

arrest is an '08 by an Arlington Heights PO for a domestic battery." (Exh. 3 CCSPD bispatch audio diskette "track" 3 at 07:250-08:00; Exh. 4 CCSPD Dispatch transcript Vol. I pg.823-24, 9:17-24).

**See 1.**

37.     Once Plaintiff closed the door Officer Prohaska heard a "metal clank" that could have been a "latch, a gun, a sword going back in the scabbard. I don't know." (Exh. 6, Off. Prohaska Dep. pg.24:2-7).

**See 1. Does not involve Defendant Contreras.**

38.     CCSPD Officers Larry Rivlin and Roger Valdez arrived on the scene at approximately 4:20 p.m. (Exh. 2, CCSPD Dispatch call log pg. 2; Exh. 4, CCSPD Dispatch transcript Vol. I pg.ll:3-7).

**Admit.**

39.     At approximately 4:22p.m., the following radio exchange occurred:

**Off. Rivlin:** "734 [Off. Rivlin] to 36 [Off. Macugowski]. Did you say there might be firearms inside there?"

**Off. Macugowski:** "10-4. Per the daughter, he had a friend with a gun, but she doesn't know what happened with the gun. And he does have an FOID revoked." (Exh. 3 CCSPD Dispatch audio diskette "track" 3 at 10:10-10:25; Exh. 4 CCSPD Dispatch transcriptVol.l pg.ll:17-20)

**This is a private transmission between Rivlin and Macugoski and not Contreras so is irrelevant. See 1 also.**

40.     Officer Prohaska proceeded to evacuate the building of all tenants. (p.36:9-l 0). "We banged on every door, got everybody out." (Transcript. p.16: 17-18). (4:47p.m.)

**Admit.**

### Second Encounter with Plaintiff

41.     The CCSPD dispatch contacted the Glenview Fire Department ("GFD") and Glenview Police Department ("GPD") to respond and provide assistance. (Exh. 4 CCSPD Dispatch transcript Vol. I pg.7:3-6, 8:17-20, 10:16-20)

**Admit.**

42.     GPD Officers Jeffery Cholewinski and Eric Eastman arrived on the scene and they were briefed by CCSPD officers regarding what had occurred. (Exhibit 8, GFD Officer

Cholewinski Deposition pg.9:11-14, 14:1-17).

**See 1.**

43.     The GPD Officers retrieved a ballistic shield from their squad car and provided it to Officer Valdez. (Exh. 8, Off. Cholewinski Dep. p.14:22-24, 15:1-8; ISP Investigatory Summary pg.l3,16). The GFD Officers then positioned themselves on the landing between the second and third floor. (Exh. 8, Off. Cholewinski Dep. pg.20:18-24; ISP Investigatory Summary pg.l4, 17; Exh. 13, ISP Scene photographs disk I, IMG_219-221_JPG).

**Admit.**

44.     Officers Rivlin and Valdez were positioned on the steps directly below the third floor landing and Plaintiff's apartment door. (Exhibit 9, CCSPD Officer Rivlin Deposition, pg. 90:4-8; Exhibit 13, ISP Scene photographs disk 1, IMG_227-232_JPG).

**The officers were not directly below the third floor landing and Plaintiff's apartment door. Officer Valdez was on the sixth and fifth stair with his feet and officer Rivlin was behind him. Admit Exhibit 13 photos. Ex. 16, Valdez dep., pg 90: 16-24, 91: 1-17, 92: 4-16.**

45.     Officer Rivlin attempted to verbally engage Plaintiff by stating that his "daughter was worried about him" and assuring him that no one was there to hurt him. (Exh. 9, Off. Rivlin Dep. pg.I62:I-I4;  Exhibit  IO, CCSPD Officer Gary Contreras Dep. pg.I64:I2-2I).

**See 1. This was before Defendant Contreras arrived.**

46.     Plaintiff responded by stating "[f]uck you. I'm going to kill you and then kill myself." *ld.*

**See 1. This was before Defendant Contreras arrived.**

47.     Once again, Officer Rivlin heard a "metal-on-mental" sound like "someone was loading a gun." (Exh. 9, Off. Rivlin Dep. pg. 9I :).

**See 1. Irrelevant what officer Rivlin heard.**

48.     As Officers Rivlin and Valdez were positioned at the top of the stairs, Plaintiff opened the door with the sword in his hand for approximately ten seconds. (Exh. 9, Off. Rivlin Dep. pg. 94:3-8, 95:1-3, 96:2-5).

**See 1.**

49.     Officer Rivlin yelled for Plaintiff to "drop the sword" and "come on out" several times before Plaintiff disregarded his commands and closed the door. (Exh. 9, Off. Rivlin Dep. pg.96:8- I 0).

**See 1.**

50.     Officer Rivlin continued his efforts to communicate with Plaintiff by pleading with Plaintiff to speak with them over a cell phone. Plaintiff responded, "do you think I am stupid, if you touch the door, I will kill you." (ISP Investigative Summary, 0012).

**See 1.**

51.     At this time, Officer Rivlin recommended that the CCSPD Hostage Barricade Team ("HBT") be notified and the CCSPD command ordered that the team respond to the scene. (Exh. 9, Off. Rivlin Dep. pg.78:I-24,  79:I-6).

**Admit.**

52.     The CCSPD command ordered that officers create a HBT "staging area" to position the CCSPD "Ballistics Vehicle", notify the ISP that squad cars would be rapidly responding to the scene via various State highways, and notify area hospitals to prepare for potential injuries. (Exh. 4, CCSPD Dispatch transcript Vol. I pg.l4:I9-22, I5:I-I2, I7:4-8, 24:3- 24; 25:I-I6, 36:2-7).

**Admit. Of note, the officers never waited for the vehicle or other members of the HBT to arrive.**

53.     The CCSPD command also requested the officers at the scene "gather intelligence" which included photographing the complex and describing the physical layout of the area. (Exh. 4, CCSPD Dispatch transcript Vol. I pg.20:2-24, 21:1-10, 23:1-7).

**Admit.**

54.     At approximately 4:47p.m. a CCSPD supervisor stated over the radio:

"You may consider talking with Larry Rivlin about at least having a react team together with a (unintelligible) team and at least force just in case this offender decides to come out and challenge you guys."
"All right. I 0-4"
"Obviously, if he doesn't, just hold it." (Exh. 4, CCSPD Dispatch transcript Vol. I pg.15:21-24;  16:1-2).

**The Exhibit simply states an unknown male speaker, not a supervisor.**

55.     Officer Contreras received the original department-wide dispatch radio-call(s) stating that "Subject with a sword ...may be suicidal" and that Plaintiff was barricaded and may be in possession of a firearm. (Exh. 5, ISP Investigative Summary pg.OOI9; Exh. 10, Off. Contreras Dep. pg.44:18-24, 45:1-5).

**Facts alleged can not be verified in stated Exhibit 5 and quote not in Exhibit 10.**

56.     As a member of the HBT, Officer Contreras also received a page instructing the team members to respond to a "code red incident" which meant "there may be possibly a barricade subject, maybe some weapons involved, some type of threat to life." (Exh. I 0, Off. Contreras Dep. pg.163:19-24, 163:1).

**It is believed the defendant should be referring to page 162 in Exhibit 10. However, none is relevant (See 1.)**

57.     At approximately 5:00 p.m., Officer Gary Contreras arrived on the scene. (Exh. 2, CCCSPD Dispatch call log pg.4). Upon arrival, Officer Contreras was informed by CCSPD Lieutenant Percy Obosco what he had already heard over the radio, namely, that Plaintiff had "barricade himself upstairs, that he had threated to kill himself and the police." (Exh. 10, Officer Gary Contreras Deposition pg.47: 13-17)

**Admit.**

58.     Officer Contreras was also infonned that Plaintiff had "repeatedly tried to stab at [the officers] before shutting the door". (Exh. 10, Officer Gary Contreras Deposition pg.l64:2- 11).

**See 1. Also, no information he was told this prior to incident. Contreras never stated he was told this prior. Ex. 10, Contreras dep., pg 163: 8-22.**

59.     At approximately 5:13 p.m. the following radio transmission occurred:

"Okay. Incoming units on Band 5, HBT. Our suspect, perhaps, is loading a long gun in the apartment. It sounds like he's loading a rifle in the apartment, and he's barricading the front door. The front door is the only access way." Exh. 4, CCSPD Dispatch transcript Vol. I pg.27:2-6).
**This is irrelevant as it came over police car radios after Defendant Contreras was in the building. See 57.**

**Final Encounter with Plaintiff**

60.     Based on his training and the CCSPD commander's directive to establish a "react team", Officer Rivlin would attempt to subdue Plaintiff with his Taser, Officer Valdez would provide cover with his ballistic shield, Officers Cholewinski and Easton would attempt to handcuff Plaintiff once he was tased, and Officer Contreras would provide "lethal" cover. (Exh. 5, ISP Investigative Summary pg.0019; Exh. 9, Off. Rivlin Dep. pg.97:21-24, 98-99, 107:1-23).

**Admit.**

61.     Providing "lethal cover" was an HBT tenn that meant if "non-lethal" force was ineffective in stopping a threat of great bodily harm or death, then the officer providing lethal cover would use deadly force. (Exh. 10, Off. Contreras Dep. pg.ll7:7-15).

**Admit.**

62.     Officers Cholewinski and Eastman were still positioned on the landing between the second and third floor. (Exh. 8, Off. Cholewinski Dep. pg.20: !8-24; ISP Investigatory Summary pg.l4, 17; Exh. 13, ISP Scene photographs disk I, IMG_219-22l_JPG).

**Admit.**

63.     While Officers Rivlin and Valdez were positioned on the steps directly below the third floor landing and Plaintiff's apartment door. (Exhibit 9, CCSPD Officer Rivlin Deposition, pg. 90:4-8; Exhibit 13, ISP Scene photographs disk I, IMG_227-232_JPG).

**See statement of fact 44, which is the same as this, and the Response.**

64.     Officer Contreras took his position on the stairs leading to the landing between the second and third floors. (Exh. 10, Off. Contreras Dep. p.95:11-22, 98:4-24).

**Admit.**

65.     Plaintiff swung his door open quickly and aggressively with the sword in hand. (Exh. 5, ISP Investigative Summary, 0017). Plaintiff then stepped out of the apartment, prompting Rivlin to yell, "drop the sword" three or four times, and "let me see your hands," but Plaintiff refused. (Exh. 9, Off. Rivlin Dep. pg.ll7: 1-23; ISP Investigative Summary, 0007, 0017).

**There is nothing in the Exhibits referred to, nor in any evidence to suggest the door opened "quickly and aggressively", nor that he stepped completely out of his apartment.**

66.     Officer Contreras observed Officer Rivlin "come out behind" the ballistic shield in order to discharge the Taser. (Exh. 10, Off. Contreras Dep. pg.177:4-24). In doing so, Officer Rivlin "expose[d] himself a great deal in order to try and use the non-lethal device." (Exh. 10, Off. Contreras Dep. pg.177:4-24).

**Officer Rivlin only exposed his right arm and head when he reached around the ballistic shield and fired his Taser at Mr. Kolgovas and then he immediately took cover completely behind the shield. Ex. 9, Rivlin dep., pg 123: 18-21, 126: 11-22.**

67.     Officer Rivlin observed Plaintiff take a step towards the Officers and "simultaneous[ly]" raised the sword. (Exh. 9, Off. Rivlin Dep. pg.118:13-20, 119:1-23). At that time, Officer Rivlin and Officer Valdez were only "two to three" feet away from Plaintiff. (Exh. 9, Off. Rivlin Dep. pg.147:10-14)

**By raising the sword, what he actually said was that the sword was at his side and then was just on the rise. As to the distance, with officer Rivlin on the fifth or fourth step, one can look at the photos and use common sense of 2-3 feet and conclude that, from where Rivlin was to Mr. Kolgovas' door is not 2-3 feet away. Ex. 9, Rivlin dep., pg. 119: 13-20; Ex. 20, Photos, No. 1, 2; also see statement 85.**

68.     As Plaintiff then lifted the sword as his body faced Rivlin, prompting Rivlin, in fear of "literally" being decapitated, to discharge his laser. (Exh. 9. Off. Rivlin Dep. pg.l70- I 71; Exh. 5, ISP Investigation Summary pg.0012)

**Rivlin devised a plan for him to use non-lethal force by using a Taser. Rivlin saw the sword just starting to raise off the floor from being pointed straight down. Rivlin got his right arm around a ballistic shield, then armed and deployed his Taser. He then took complete cover behind the shield. In addition, Rivlin states that while the sword began to rise it never came toward him. (see fact 87) This deposition explanation on firing his Taser is contrary to his subsequent allegation he feared being decapitated while being behind the shield. In addition, Rivlin's reasons, fears and thoughts have no relevancy whatsoever in this matter. The sole issue**

**involve acts of Defendant Contreras (See 1) Ex. 5 pg. 12; ex. 9, Rivlin dep., pg. 119: 1-23, 120: 15-24, 121: 1-24, 122: 1-24, 123: 1-21, 126: 11-22**

70. Officer Contreras "heard the Taser go off. My weapon was on safe when the Taser went off. When I saw that the deceased did not drop and he was raising a sword up, I took my weapon off safe and I depressed the trigger, firing one round and putting my weapon on safe." (Exh. 10, Off. Contreras Dep. pg.144:5-14).

**This scenario is not only contradicted by every other officer present, but by his own statement given shortly after the shooting. Everyone present said that when the Taser went off the rifle shot by Contreras was simultaneous. Thus, this statement of all these motions and alleged acts performed before firing is without support. Ex. 9, Rivlin dep., pg. 127: 11-14, 128: 1-3; Ex. 5, statements of officers at scene, including Defendant Contreras, pg. 10, 12, 14, 20; Ex. 17, officer Eastman dep., pg 74: 15-24, 75: 1-4, Ex. 8, Cholewinski dep., pg; 45: 9-24.**

71. Officer Contreras fired the shot "because the Taser did not effectively stop the deceased. And when I observed that his sword was coming off the ground toward Officer Rivlin, I knew that Officer Rivlin's life was in jeopardy  or he may be mangled or receive some type of great bodily harm. And it's my job not to allow that to happen to another officer to anyone, any innocent civilian." (Exh. 10, Off. Contreras Dep. pg.ll7:7-24, 118:1-4)

**This is contradicted by the facts since the sword was not coming toward officer Rivlin, and he would not know if the Taser was effective or not as he had no training on Tasers and he fired his rifle before Mr. Kolgovas fell from its incapacitation of him.. Further, this is a self serving conclusion without support other than he said it on his deposition. Ex 10, Contreras dep., pg. 65; 24, 66: 1-8; see fact 87, and fact 89.**

72. The Officers entered Plaintiff's apartment, restrained him, and the paramedics "were there almost immediately" to begin rendering medical assistance. (Exh. 8, Off. Rivlin Dep. pg.137:6-24, 139:21-24, 140:1-12).

**Admit.**

## CCSPD Officers Training and Expertise

73.      Both Officer Gary Contreras and Larry Rivlin have received the following training in the use of firearms and use of force while their capacities as Cook County Department of Corrections ("CCDOC") officers, CCSPD officers, and HBT members: I) CCDOC training academy that consisted of 480-hours of instruction (Exh. 9, Off. Rivlin Dep. 7:12-24, 8:1-6, Exh. 10, Off. Contreras Dep. pg.l5-16, Exhibit 15, Officer Brian Hartsfield Deposition pg.6-7); 2) CCSPD training academy that consisted of an additional 440-hours of instruction (Exh. 9, Off. Rivlin Dep. 8:7-17; Exh. I 0, Off. Contreras Dep. pg.l7:3-24; Exh. 15, Off. Hartsfield Dep. pg.6- 8); 3) HBT training that included an initial 40-hour course and 16-hours of training a month in the areas including firearms and use of force (Exh. 9, Off. Rivlin Dep. I 0:5-24; Exh. I 0, Off. Contreras Dep. pg.20:5-15, 21:23-24); 4) and 16-hours of annual CCSPD "in-service" training which includes firearm recertification. (Exh. 15, Off. Hartsfield Dep. pg.l2:6-21,  13:3-8)

**Admit, however none of the training dealt with protection of shields or helmets from edged weapons. Contreras was never trained on Tasers, never trained on the use of deadly force where a Taser is also involved, never trained on what to do when the situation involves a stairway, never trained on the use of deadly force when it involves an intoxicated person. Ex. 9, Rivlin dep., pg 150: 2-7, 151: 9-21, 152: 3-24, 153: 1; Ex. 15, Hartsfield dep., pg. 38: 8-17, 57: 13-24, 58: 1-7, 71: 19-24, 72: 1-12, 82: 13-24, 83: 1-8.**

74.      In addition to the approximately 960-hours of academy training, 16-hours of monthly HBT training, and 16-hours of annual "in-service" training; Officer Contreras has received approximately 208-hous of additional training since he joined the CCSPD in September 2005 until the incident occurred on January 24, 2010. (Exhibit 14, CCSPD Training records for Officers Rivlin and Contreras pg.l-3).

**See 73.**

75.      According to Officer Rivlin's and Officer Contreras' training, a sharped edge weapon like Plaintiffs sword is able to pierce a ballistic shield and ballistic vest. (Exh. 9, Off. Rivlin Dep. 18:11-19, 150:2-7; Exh. 10, Off. Contreras Dep. pg.64:7-24,  177:10-24)

**Deny. They were not trained in this regard according to the CCSPD trainer on use of force, Brian Hartsfield. In addition, officer Rivlin as a HBT member was not wearing just a ballistic vest but a level III Molle ballistic vest with a chest plate in it, which Rivlin believes was ceramic and the CCSPD use of force trainer believes is 1/4" steel, which will stop almost any handgun round, a rifle round and a knife blade. Ex. 9, Rivlin dep., pg. 15: 8-24, 16: 1-10, 17: 15-24, 18: 1-24, 19: 1-16; Ex. 15, Hartsfield dep., pg. 86: 14-23, 87: 5-7, 22-24, 88: 1-6, 89: 12-22.**

76.    As a result, Officer Contreras believed the ballistic shield or vest(s) would not prevent Plaintiffs sword from seriously wounding or killing Officer Valdez, or Officer Rivlin based on Plaintiffs proximity to the officers. (Exh. 10, Off. Contreras Dep. pg.64:7-24, 177:10- 24).

**This can be challenged in numerous ways. This contradicts all the training or non-training (see 73 and 75). He even admits he doesn't know what the sword would do to the shield. Also, his belief as to Rivlin's vest is totally without merit as HBT members, which included Rivlin and Contreras, wore category III vests with plates which will stop a blade. Ex. 10, Contreras dep., pg. 64: 20-24, 65: 1-2; Ex. 9, Rivlin Dep., pg. 15: 8-24, 16: 1-10, 17: 15-22, 18: 23-24, 19: 1-10; Ex. 16, Hartsfield dep., pg. 87: 5-7.**

### Medical Examination of P1aintiff

77.    On January 25, 2010, the Cook County Medical Examiner's Office Forensic Pathologist, Dr. James Filkin, performed the autopsy of Plaintiff. (Exhibit 11, Dr. James Filkin Deposition pg.6:1-2, 9:1-3, Exhibit 12, Plaintiffs Postmortem Examination pg.l)

**Admit, however the Doctor performed two examinations, the first on January 25, 2010 and then another on January 26, 2010 after getting additional evidence and Taser information. Ex. 11, Dr. Filkins dep., pg. 66: 23-24, 67: 1-12, 52: 21-24, 53: 7-24, 54: 1-7 and 8-23; Ex. 12, page 1 of report.**

78.    Once Dr. Filkin was informed that CCSPD Officers attempted to Taser Plaintiff, he "thoroughly reexamined the body" and only found injuries "so very superficial involving only the outermost layer of the skin that they don't pierce more deeply and, therefore, don't provide any characteristic appearance that would indicate a defect produced by a dart, a barb or anything like that.

There could have equally been produced by a fingernail, a scratch from a fingernail by someone involved in the medical care of this individual." (Exh. 11, Dr. Filkin Dep. pg.69:15-24, 70: 1-18)

**He was not informed the CCSPD officers "attempted" to Taser Mr. Kolgovas. The reports he received stated that Mr. Kolgovas had been Tasered and then shot. In addition, Dr. Filkins also testified that he found marks on the body which he pointed out after receiving the information Mr. Kolgovas was tased which could be entry areas of Taser probes on Mr. Kolgovas' body. Ex. 11, Dr. Filkins' dep., pg. 66: 23-24, 67: 1-24, 68: 1-24, 69: 1-14.**

79.     Dr. Filkin also examined Plaintiffs bullet wound and found a "concentric rim of abrasion" which means the "rim is more or less of an even thickness around the bullet hole." (Exh. 11, Dr. Filkin Dep. pg.77:22-24, 78:1). Based on the wounds "concentric" nature, Dr. Filkin could determine that the bullet entered Plaintiffs body at a 90-degree or right angle. (Exh. 11, Dr. Filkin Dep. pg.78:9-24).

**Admit.**

80.     Based on the wounds "concentric" nature Dr. Filkin stated Dr. Filkin the "individual who was shot would have to be standing straight up ... At the time the bullet struck the body, the shooter or the muzzle of the gun would have to be more or less in front of the individual." (Exh. 11, Dr. Filkin Dep. pg.84:3-24, 85:1-14). Dr. Filkin was provided the following scenario and gave the following answer:

> "Q. Doctor, based on your findings that it was a concentric rim of abrasion for the wound entry and if the shooter was approximately six to seven feet below Mr. Kolgovas, the bullet wound indicates that he would be leaning forward or lunging forward at the time of the shooting? A. Well, the hypothetical you gave me where he might be in a forward position would be consistent with the appearance of the rim and also consistent with the bullet would path through the body, could be. So that's a scenario that might work." (Exh. II, Dr. Filkin Dep. pg.92:5-21)

**This is an incomplete statement of the Doctor's testimony as to how the concentric rim of abrasion could be caused. In addition to standing straight up at the time the bullet struck, Mr. Kolgovas could have been bent over so the bullet trajectory would then go straight up into him from below. The above question and answer quoted on page 95 of the Doctor's deposition leaves out the objection made to the inclusion of the word "lunging." There has been no testimony from**

any witness in this case, including the Defendant Contreras, that Mr. Kolgovas at any time lunged forward, including at the time when he was shot. Even the Defendant Contreras admits that at the time he shot Mr. Kolgovas, Mr. Kolgovas was standing in his doorway. Ex. 11, Dr. Filkins dep., pg. 85: 3-24, 86: 5-23, 92: 11-15; Ex. 10, Contreras dep., pg. 72: 2-12.

## PLAINTIFFS' LOCAL RULE 56.1 (b) STATEMENT OF ADDITIONAL FACTS

81.     Dr. Filkins stated that the concentric nature of the bullet wound can be explained if Mr. Kolgovas was falling forward or down after being Tasered when the person below, Defendant Contreras, shot him. Ex. 11, Dr. Filkins Dep., pg. 86: 13-23; Ex. 20 Photos, No. 7.

82.     Dr. Filkins, the medical examiner of Cook County assigned this matter, which involved a Taser deployment and police shooting, had never done an autopsy or exam on anyone who had been Tasered, this is the only autopsy he performed for the medical examiner's office which involved a Taser or Taser probe. He had never seen a body before that had been penetrated by a Taser dart. Ex. 11, Dr. Filkins dep., pg. 56: 20-24, 57: 1-8, 61: 5-9, 71: 1-14.

83.     Dr. Filkins examined Mr. Kolgovas' clothing, found the Taser marks, then checked the body to see if there were matching marks on the body that could be probe marks. He took photos showing the Taser probe with the point through Kolgovas' jacket and his pointing to probe marks on the body that matched. He found no other such marks on the body. Ex. 11, Dr. Filkins dep., pg. 73: 13-24, 74: 1-4, 76: 10-19, 77: 2-4; Ex. 20, photos No. 8, 9, and 10.

84.     When a Taser gun is deployed it fires probes, attached to the end of wires. The top probe goes approximately where one aims and the bottom probe hits downward and somewhat to the right to get separation for muscle contracture. An electrical charge goes through the wires which disrupts the nervous system or motor functioning system of the body and causes a person to fall down. A probe does not have to actually penetrate skin for there to be a connection because the electricity will arc through clothing up to a combined 2" of clothing. The more muscular someone is the more effective the Taser. The muscles are contracted and the charge overrides the brain and incapacitates

the person. Because of the way a Taser works, whether a person was under the influence of alcohol or not would make no difference to its effectiveness. Ex. 8, Cholewinski dep., pg. 51: 1-24, 52: 1-17, 57: 17-24; Ex. 9, Rivlin dep., pg. 49: 18-24, 50: 16-24; Ex. 11, Dr. Filkins dep., pg. 61: 10-24, 62: 1-8; Ex. 16, Valdez dep., pg. 21: 19-21, 23: 2-24; 24: 1-2.

85.     At the time of the shooting officer Valdez was holding a ballistic shield with his left foot was on the sixth stair before the third floor landing and his right foot was on the fifth stair and officer Rivlin was behind him to his right. Ex. 16, Valdez dep., pg. 90: 16-24, 91: 1-17, 92: 4-16; Ex. 20, Photos, No. 2.

86.     Arturas Kolgovas opened his door and took a step into his doorway. When shot, he was between his door frames standing in the doorway. He stood in that position five to ten seconds before he was shot,. When shot, he fell back into his apartment on his stomach. Ex. 10, Contreras dep., pg. 72: 2-12, 110: 9-11, 111: 3-11, 172: 5-15; Ex. 9, Rivlin dep., pg. 145: 15-21; Ex. 8, Cholewinski dep., pg. 58: 11-14. Ex. 20, Photos, No. 1, 2, 3.

87.     Officer Rivlin saw the sword coming up. It was not coming toward him. It was just starting to raise off the floor from being pointed straight down when Officer Rivlin tased Mr. Kolgovas. Ex. 9, Rivlin dep. pg. 119: 15-24, 120: 1-24, 121: 1-24, 122: 1-4, 21-24, 123: 12-17, 155: 20-24, 156: 1-4; Ex. 10, Contreras dep., pg. 70: 12-22.

88.     Officer Rivlin reached around the ballistic shield to Taser Mr. Kolgovas. When he fired the Taser his right arm was around the shield and his legs and body were behind the shield. After he fired the Taser he took cover behind the shield. He aimed his Taser for the middle of Mr. Kolgovas' chest. Ex. 9, Rivlin dep., pg. 64: 22-24, 65: 1-6, 123: 18-21, 126: 11-22.

89.     At the time Officer Rivlin fired his Taser, Officer Contreras simultaneously shot Mr. Kolgovas with an M4 rifle with bullets designed to explode upon impact. Ex. 9, Rivlin dep., pg. 127: 11-14, 128: 1-3; Ex. 5, Statements of Officers at scene: Valdez, Cholewinski, Eastman, Rivlin, Contreras, pg. 10, 12, 14, 20; Ex. 17, Eastman dep., pg. 74: 15-24, 75: 1-4; Ex. 8, Cholewinski dep., pg. 45: 9-24; Ex. 10, Contreras dep., pg. 25: 17-20, 26: 12-15, 40: 18-24, 41: 1-24, 42: 1-3.

90.     After being Tasered and shot, the Taser operator (Rivlin) still had the Taser gun in his hand after going into Mr. Kolgovas' apartment and officer Cholewinski had to disconnect the cartridge from the Taser because Officer Rivlin didn't and let it drop to the floor. Ex. 8, Cholewinski dep., pg. 53: 19-24, 54: 1-5, 23-24, 55: 1-14, 70: 5-12; Ex. 20, Photos, No. 5, 6.

91.     The Taser had deployed. The Taser wires went directly to Mr. Kolgovas. Officer Cholewinski told paramedics that Mr. Kolgovas had been Tasered and for them to be careful because the probes were in Mr. Kolgovas' body. Ex. 8, Cholewinski dep., pg. 70: 13-19, 23-24, 71: 1-8.

92.     Nothing prevented Officer Rivlin or Officer Valdez from backing down the stairs. Ex. 9, Rivlin dep., 156: 6-13; Ex. 8, Cholewinski dep., pg. 74: 19-24, 75: 1; Ex. 18, O'Brien dep., pg. 117: 20 -24, 118: 1-14.

93.     There was nothing in the opinion of Officer Hartsfield, a CCSPD use of force trainer, that would have prevented an officer with a Taser from being able to effectively Taser Mr. Kolgovas if that officer would have halfway up the stairway to Mr. Kolgovas' Apartment instead of being higher up and closer to his apartment. Ex. 15, Hartsfield dep., pg. 59: 4-19.

94.     Mr. Kolgovas was alive and moaning afterward and was still alive when the paramedics arrived at Lutheran General Hospital. He then died at 9:00 p.m. Ex. 17, Eastman dep., pg. 86: 18-24, 87: 1; Ex. 5, Statements of Paramedics, pg. 23, 24, 25; Ex. 11, Filkins dep., pg. 26: 7-13.

95.     Officer Contreras never received any training on Tasers or attended any classes involving Tasers. Ex. 10, Contreras dep., pg. 65: 24, 65: 1-10.

96.     The shooting took place after the HBT was requested but not yet fully activated. At the time of the incident, officers Contreras and Rivlin were the only members of the Hostage Barricade Team (HBT) at the scene. Officer Contreras knew this was a HBT situation and HBT was en route to the scene. Several members arrived after the shooting. Ex. 10, Contreras dep., pg. 19: 23-24, 20: 1, 48: 12-24, 49: 1-24, 50: 1-24, 51: 1-24, 52: 1-15; Ex. 16, Valdez dep., pg. 135: 16-24, 136: 1-9.

97.     Prior to January 24, 2010, Defendant Contreras had never shot at anyone as a member of the HBT, nor since that date. His only involvement in a HBT situation where another member shot at anything was when they shot a dog. Ex. 10, Contreras dep., pg. 24: 21-24, 25: 1-12.

98.     Officer Rivlin devised a plan to take Mr. Kolgovas into custody and made assignments for himself and the other four officers present. He assigned himself to "go Taser", which meant that he would use less than lethal force to restrain Mr. Kolgovas. Ex. 5, Rivlin Statement, pg. 12.

99.     After the shooting, officer Valdez went into Mr. Kolgovas' apartment holding the ballistic shield. He felt the shield was adequate to protect him from either a firearm or sword. Ex. 16, Valdez dep., pg. 136: 10-23, 138: 23-24, 139: 1-23; Ex. 19, Specifics of the Ballistic Shield.

100.    Sergeant Richard O'Brien is a member of the HBT and instructor of HBT members. All HBT members were required to wear Level III vests with plates. He can not recall any demonstrations or instructions given to non-certified Taser users on what happens when someone is Tasered and there are no courses conducted by HBT that discusses Taser use and what happens when someone is Tasered. He can not recall any course that discusses what will happen if an edged weapon strikes a ballistic shield. He does not remember receiving any course or instruction as to whether or not the vest with plate would stop an edged weapon. Ex. 18, O'Brien deposition, pg. 8: 21-23, 9: 8-22, 28: 4-14, 38: 2-21, 42: 10-12, 49: 1-5, 88: 18-24, 89: 1-6.

101.    Sergeant Richard O'Brien, an HBT instructor, has himself been Tasered. When that happened, his muscles contracted, then he bent forward, then two people lowered him to the floor. Ex. 18, O'Brien dep., pg. 89: 18-24, 90: 1-19.

102.    Sergeant Richard O'Brien, an HBT instructor, agrees that HBT members are taught that should they encounter a person that's intoxicated or seems to act irrational a negotiator should be called in, in a HBT incident. The same is true in situations involving a person displaying suicidal tendencies. There were about 14 negotiators on the HBT in 2010 that were part of the HBT. Ex. 18, O'Brien dep., pg. 106: 17-22, 108: 17-23, 111: 14-24, 112: 1-12.

103.	Neither Officer Rivlin nor Officer Contreras, the only HBT members at the scene, were HBT negotiators. Ex. 18, O'Brien dep., pg. 106: 17-24, 107: 1-2.

104.	Officer Brian Hartsfield is a recruit coordinator who, along with five other officers who taught the same course and used same materials in 2010, trained new police officers and retrained current officers on the use of force. He teaches officers by giving different scenarios as to when use of deadly force can and cannot be sued, however, there has never been a scenario given officers which involved someone that used deadly force where a Taser has also been involved. He has never given officers a scenario that instructs officers that when someone is first Tasered, officers should wait to see the reaction from the Taser before deadly force is used. Ex. 15, Hartsfield dep. pg. 10: 8-14, 11: 9-24, 12: 1-5, 38: 8-22, 44: 14-24, 45: 1, 82: 18-24, 83: 1-8.

105.	When CCSPD officers are trained on use of force, they are never instructed nor trained with regard to situations involving stairways and firing of a Taser followed by the use of deadly force. Ex. 15, Hartsfield dep., pg. 57: 6-24, 58: 1-7.

106.	The CCSPD officers are not given any specific instruction on use of force when an intoxicated person is involved or the use of force against people who might have a temporary mental incapacitation. Ex. 15, Hartsfield dep., pg. 72: 1-12, 73: 1-3, 9-14, 131: 6-15.

107.	It is the policy of the Sheriff's department, and officers are taught, that an officer may resort to use of force with a firearm only after all other reasonable means at their disposal to effect control have been attempted without success. This is set forth in General Order OPS 00 01 D and Special Order OPS 01-27-E, which have been in effect since 2001, which are meant to be followed by the Sheriff Department officers. The OPS 01-27-E Order also states officers will not needlessly endanger themselves to conform with the contents of the Order. Ex. 15, Hartfield dep., pg. 96: 3-22, 21: 9-12, 22: 23-24, 23: 1-23, 24: 1-7, 25: 16-24, 26: 1-8, 48: 1-24, 49: 1; Ex. 21, pg. 787 II Policy; Ex. 22, pg. 904 V A.

108.     According to Brian Hartsfield, who teaches use of force to CCSPD officers and gives officers scenarios on CCSPD acceptable use of deadly force, in this matter the fact of Mr. Kolgovas just standing in his doorway with a sword in his hand justifies that a CCSPD officer can shoot him. Mr. Kolgovas opening his door and simply standing in his doorway with a sword in his hand would justify a CCSPD officer to fire. Ex. 15, Hartfield dep., pg. 126: 1-24, 127: 1-11, 129: 13-22, 138: 7-14.

109.     The fact that Mr. Kolgovas was intoxicated and acting irrational was something the shooting officer should have taken into consideration, but this is not taught to officers of the CCSPD. Ex. 15, Hartsfield dep., pg. 138: 15-18.

110.     A person who's intoxicated is not able to walk as well, move as well or act as well. Ex. 15, Hartsfield dep., pg. 139: 19-24, 140: 1.

Respectfully submitted,


/s/    Geoffrey G. Johnson___
        Geoffrey G. Johnson


Geoffrey G. Johnson
LAW OFFICE OF GEOFFREY G. JOHNSON
20 North Clark Street
Suite 3100
Chicago, IL 60602
(312) 263-6969