# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TRISHA HINOJOSA, individually and as Special Administrator and Special Representative of the Estate of ARTURAS KOLGOVAS, DECEASED,<br><br>   Plaintiff,<br><br>  v.<br><br>SHERIFF OF COOK COUNTY, COOK COUNTY SHERIFF'S POLICE DEPARTMENT, COOK COUNTY, and GARY C. CONTRERAS,<br><br>   Defendants. | Case No. 13 C 9079<br><br>Judge Joan H. Lefkow |

## OPINION AND ORDER

Trisha Hinojosa filed suit on her own behalf and as special administrator of her husband's estate against the Sheriff of Cook County ("the Sheriff"), the Cook County Sheriff's Police Department ("CCSPD"), Cook County, and CCSPD officer Gary C. Contreras, in Illinois state court on December 10, 2013. (Dkt. 1-1.) Defendants removed the action to this court on December 20, 2013. (Dkt. 1.) The case arises from the death of Hinojosa's husband, Arturas Kolgovas, who was shot by Contreras on January 24, 2010 during an altercation at Kolgovas's apartment. Hinojosa's seven-count second amended complaint asserts state-law claims for wrongful death, survival, funeral expenses, and negligence against one or more defendants, as well as federal claims against Contreras for excessive use of force and against the Sheriff for failure to train under 42 U.S.C. § 1983. (*See* dkt. 17 ("Compl.").) Defendants have moved for

1

summary judgment. (Dkt. 25.) For the reasons stated below, the motion is granted in part and denied in part.[1]

## BACKGROUND[2]

**I.     History with CCSPD**

CCSPD officers encountered Kolgovas at least twice prior to the incident that resulted in his death. On April 24, 2008, officers responded to a check-for-well-being advisory at Kolgovas's third-floor apartment in Northbrook, Illinois. (Dkt. 26 ("Defs.' L.R. 56.1") ¶ 1.) The officers discovered Kolgovas lying on his couch and found several suicide notes nearby. (*Id.* ¶ 3.) An ambulance transported Kolgovas to the hospital where he was involuntarily admitted for care. (*Id.* ¶ 4.)

Officers visited Kolgovas's residence again on January 4, 2009. (*Id.* ¶ 5.) When they arrived, Hinojosa informed them that Kolgovas was suicidal and had been trying to drink himself

---

[1] The court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367(a). Venue is appropriate in this district under 28 U.S.C. § 1391(b).

[2] Unless otherwise noted, the facts in this section are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to Hinojosa. The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citation omitted). In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background only those portions of the statements and responses that are appropriately supported. Any facts that are not controverted as required by Rule 56.1 are deemed admitted.

In her Local Rule 56.1 response (dkt. 36), Hinojosa repeatedly objects to the admissibility of facts outside the time period of the shooting and unknown to Contreras at the time he pulled the trigger as irrelevant to the issues set to be resolved in this case. While Hinojosa is correct that "evidence outside the time frame of the shooting is irrelevant and prejudicial" when considering a charge of excessive force under the Fourth Amendment, *see Palmquist* v. *Selvik*, 111 F.3d 1332, 1339 (7th Cir. 1997), she does not contest the truth of the facts as a general matter. Thus, while the court will view Contreras's conduct "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" in considering Hinojosa's Fourth-Amendment claim, *Graham* v. *Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989), it will set forth facts outside the time frame of the shooting in this section for the purposes of background.

to death. (*Id.* ¶ 6.) The officers transported Kolgovas to the emergency room for treatment. (*Id.* ¶ 7.)

## II.       January 24, 2010 Incident

On January 24, 2010, an intoxicated Kolgovas began yelling at his daughter Eve at his apartment and demanded that she buy him more alcohol. (*Id.* ¶ 13.) When Eve refused, Kolgovas screamed and threw beer cans at her. (*Id.* ¶¶ 13–14.) Eve locked herself in the bedroom and called 911, but Kolgovas forced the door open. (*Id.* ¶¶ 14–15.) Believing that her father was going to hurt her, Eve ran out of the apartment. (*Id.* ¶ 16.)

After receiving Eve's call at approximately 4:00 PM, the CCSPD dispatcher made a department-wide radio transmission for a well-being check at Kolgovas's apartment and stated, "Previous incident was for suicidal male subject. It was Eve's father. There was a caution in the previous CR indicating that he will fight police." (*Id.* ¶ 10.) CCSPD officers Ronald Prohaska and Henry Macugowski were the first officers to arrive at the scene. (*Id.* ¶ 17.) There, they discovered Eve, who was scared and distraught. (*Id.* ¶ 18.)

Prohaska and Macugowski made their way to the third floor, knocked on Kolgovas's door, and identified themselves as police officers. (*Id.* ¶¶ 20, 23.) Kolgovas opened the door approximately three to four inches but refused to leave his apartment. (*Id.* ¶¶ 24, 26.) Suddenly, Kolgovas thrust a samurai sword through the opening of the door and stabbed at the officers two or three times. (*Id.* ¶¶ 27, 29.) Kolgovas ignored the officers' command that he drop his weapon and told the officers that "if someone is going to come in, they are going to die." (*Id.* ¶ 30.) Kolgovas slammed his apartment door shut, locking the dead bolt. (*Id.* ¶ 33.)

The dispatcher provided additional information over the radio at approximately 4:14 PM and notified the officers that Kolgovas had "a revoked [firearm owner's identification] card" and

had a total of four prior arrests: "six charges, no conviction, for traffic; one charge, no conviction, dangerous drugs; one charge, no conviction, for assault; last arrest is an '08 by an Arlington Heights PO for a domestic battery." (*Id.* ¶ 36. ) CCSPD officer Larry Rivlin, a member of the Hostage Barricade Team ("the HBT"), and officer Roger Valdez arrived at the scene at approximately 4:20 PM. (*Id.* ¶ 38.) Glenview Police Department ("GPD") officers arrived shortly thereafter. (*Id.* ¶ 42.)

The GPD officers retrieved a ballistic shield from their squad car and provided it to Valdez. (*Id.* ¶ 43.) Then, the GPD officers positioned themselves on the second-floor landing, while Valdez and Rivlin stood on the steps leading up to the third floor. (*Id.* ¶¶ 43–44.) Rivlin attempted to persuade Kolgovas to come out of his apartment, but Kolgovas refused. (*Id.* ¶¶ 45–46.) As Valdez and Rivlin were standing on the stairs, Kolgovas opened the door with his sword in his hand. (*Id.* ¶ 48.) Kolgovas ignored Rivlin's command that he drop his weapon and closed the door again. (*Id.* ¶ 49.) Rivlin heard sounds from inside the apartment suggesting that Kolgovas was loading a gun. (*Id.* ¶ 47.)

At that point, Rivlin recommended that the HBT be notified. (*Id.* ¶ 51.) CCSPD command issued a code red, meaning that there was "a barricade subject, maybe some weapons involved, [and] some type of threat to life," and ordered the HBT to respond to the scene. (*Id.* ¶ 56.) Further CCSPD command directed officers (1) to create an HBT staging area where the HBT could position the CCSPD ballistics vehicle, (2) to notify the Illinois State Police that squad cars would be responding and traveling rapidly to the scene via state highways, and (3) to alert area hospitals to prepare for potential injuries. (*Id.* ¶ 52.) CCSPD command also ordered officers at the scene to gather intelligence by photographing the apartment complex and describing the physical layout of the area. (*Id.* ¶ 53.)

4

Contreras, a member of the HBT, arrived at the apartment complex at approximately 5:00 PM. (*Id.* ¶ 57.) Contreras had received the department-wide dispatches stating that previous incidents at Kolgovas's apartment had involved a suicidal male who had a tendency to "fight police" and that Kolgovas had a revoked firearm owner's identification card and four prior arrests. (*Id.* ¶ 55.) Contreras had also been notified (as a member of the HBT) of the existence of a code-red incident. (*Id.* ¶ 56.) On arrival, Contreras was told that Kolgovas had barricaded himself in his apartment and that he had threatened to kill himself and the police. (*Id.* ¶ 57.)

The officers subsequently devised a plan where Rivlin would attempt to subdue Kolgovas with a taser while Valdez provided cover for Rivlin with his ballistic shield.[3] (*Id.* ¶ 60.) GPD officers would handcuff Kolgovas once he was tased, and Contreras would provide lethal cover with his M4 rifle, meaning that if non-lethal force was ineffective in stopping a threat of great bodily harm or death, Contreras would use deadly force. (*Id.* ¶¶ 60–61.) Rivlin and Valdez positioned themselves on the steps leading to the third-floor landing, while Contreras stood on the stairs between the first and second floors. (*Id.* ¶¶ 63–64.)

Kolgovas opened his door with his sword in hand pointed down, and Rivlin ordered him to drop his weapon. (*Id.* ¶ 65; dkt. 36 ("Pl.'s L.R. 56.1") ¶ 67.) Kolgovas refused, took a step towards Rivlin and Valdez, and began to raise his sword. (Defs.' L.R. 56.1 ¶¶ 65, 67.) Rivlin testified that the sword did not rise more than ninety degrees from the ground. (*See* dkt. 26-9 ("Rivlin Dep.") at 121: 22–24.) This action prompted Rivlin to reach around the ballistic shield and discharge the taser.[4] (Defs.' L.R. 56.1 ¶ 68.) Contreras fired his weapon, hitting Kolgovas

---

[3] Contreras testified that ballistic shields are not designed to stop a sharp-edged weapon like Kolgovas's sword, although they are capable of stopping a handgun round. (*See* dkt. 26-10 at 64: 11–19.)

[4] The parties dispute the extent to which Rivlin exposed himself to discharge the taser. While Contreras testified in his deposition that Rivlin "expose[d] himself a great deal in order to try and use the non-lethal device" and that most of Rivlin's torso was exposed, (*id.* at 177: 4–24), other testimony

5

in the chest and causing Kolgovas to fall back into his apartment. (*Id.* ¶¶ 70–71; Pl.'s L.R. 56.1 ¶ 86; *see also* dkt. 27 at 5.) The officers entered Kolgovas's apartment and restrained him, and paramedics arrived "almost immediately." (Defs.' L.R. 56.1 ¶ 72.) Kolgovas was pronounced dead at 9:00 PM. (Pl.'s L.R. 56.1 ¶ 94.)

The parties dispute whether Contreras fired his weapon at the same time Rivlin discharged the taser or after. In support of their theory that Contreras fired his weapon after Rivlin deployed the taser, defendants point to Contreras's deposition, where he testified that his "[w]eapon was on safe when the taser went off. When I saw that the deceased did not drop and he was raising a sword up, I took my weapon off safe and I depressed the trigger." (Dkt. 26-10 at 144: 5–9.) Hinojosa, by contrast, contends that Contreras fired his weapon simultaneously with Rivlin's discharge of the taser, a version of the events that also finds support in the record. Indeed, GPD officer Eric Eastman testified in his deposition that he heard "a single gunshot" and "the electric sound of the taser" simultaneously. (Dkt. 36-2 Exh. 17 at 74: 19–22 ("It was simultaneously, correct.").) Similarly, GPD officer Jeff Cholewinksi testified that the taser and Contreras's weapon were discharged "[a]s near as simultaneous as you can get." (Dkt. 26-8 at 48: 10–16.)

### III. Autopsy of Kolgovas

Dr. James Filkin, the Cook County Medical Examiner's Office Forensic Pathologist, performed Kolgovas's autopsy on January 25, 2010 and inspected the body again the following day. (Defs.' L.R. 56.1 ¶ 77; Pl.'s L.R. 56.1 ¶ 77.) Filkin identified marks on Kolgovas's skin that could have been produced by the taser but was unable to confirm that this was the case. (Defs.' L.R. 56.1 ¶ 78.) As Filkin explained, the injuries were "so very superficial involving

---

suggests that only Rivlin's head and right arm were exposed. (*See, e.g.*, Rivlin Dep. at 123: 18–21, 126: 13–14.)

only the outermost layer of the skin that they don't pierce more deeply and, therefore, don't provide any characteristic appearance that would indicate a defect produced by a dart, a barb or anything like that." (*Id.* (quoting dkt. 26-11 ("Filkin Dep.") at 70: 7–11).) According to Filkin, the marks "could have equally been produced by a fingernail, a scratch from a fingernail by someone involved in the medical care of this individual." (*Id.* (quoting Filkin Dep. at 70: 11–14).)

Filkin also examined Kolgovas's bullet wound and found it lined with a concentric rim of abrasion, meaning that the "rim is more or less of an even thickness around the bullet hole." (*Id.* ¶ 79 (quoting Filkin Dep. at 77: 24–78: 1).) Based on the wound's concentric nature, Filkin determined that the bullet entered Kolgovas at a right angle, which could have occurred if Kolgovas had been standing straight up and Contreras had been standing "more or less" in front of Kolgovas. (*Id.* ¶¶ 79–80 (quoting Filkin Dep. at 84: 16).) In response to questioning by defense counsel, however, Filkin acknowledged that the wound could also be consistent with a scenario in which Contreras fired his weapon from "approximately six to seven feet below" Kolgovas while Kolgovas was "leaning . . . or lunging forward at the time of the shooting." (*Id.* ¶ 80 (quoting Filkin Dep. at 92: 7–10, 16–21).) Moreover, Filkin testified that the concentric nature of the wound could be explained if Contreras discharged his gun when Kolgovas was falling forward or down after being shocked by the taser. (Pl.'s L.R. 56.1 ¶ 81.)

## IV. CCSPD Training

Contreras received substantial training on the use of force and firearms as a CCSPD officer and member of the HBT. (*See* Defs.' L.R. 56.1 ¶ 73.) For example, he participated in 480 hours of instruction through the Cook County Department of Corrections' training academy, received an additional 440 hours of training though the CCSPD training academy, and engaged

in an initial forty-hour course and sixteen hours of annual in-service training through the HBT over the course of his career. (*Id.*) He also participated in sixteen hours of annual CCSPD training, including firearm recertification. (*Id.*) Richard O'Brien, however, a sergeant with the CCSPD and a training instructor for the HBT, could not recall whether any course had been offered by the CCSPD for officers not certified in taser use regarding "what happens when someone is" shocked by a taser or "what will happen if an edged weapon strikes a ballistic shield." (Pl.'s L.R. 56.1 ¶ 100.) Similarly, Brian Hartsfield, a CCSPD sergeant who has trained officers on the use of force, testified that he has never trained officers "with regard to situations involving stairways and [the] firing of a [t]aser followed by the use of deadly force." (*Id.* ¶ 105.)

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91

8

L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

## ANALYSIS

I.  **Claims Under § 1983 Against Contreras and the Sheriff**

   A.  **Excessive Force Claim Against Contreras**

Count VII, against Contreras, alleges excessive use of force under 42 U.S.C. § 1983. Defendants contend that Hinojosa's claim fails because the undisputed facts establish that Contreras's use of force was reasonable.

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham* v. *Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (emphasis omitted). This standard requires courts to "examine the totality of the circumstances to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government interests at stake." *Jacobs* v. *City of Chi.*, 215 F.3d 758, 773 (7th Cir. 2000). The constitutional inquiry is objective, and courts must view the matter "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396–97. Moreover, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Ryburn* v. *Huff*, --- U.S. ---, 132 S. Ct. 987, 992, 181 L. Ed. 2d 966 (2012) (alteration omitted) (quoting *Graham*,

9

490 U.S. at 396–97). If an officer believes that the suspect's actions place him or others in the immediate vicinity in imminent danger of death or serious bodily injury, an officer can reasonably use deadly force. *See DeLuna* v. *City of Rockford, Ill.*, 447 F.3d 1008, 1010 (7th Cir. 2006). That danger has been established when the suspect threatens the officer with a weapon. *See Bell* v. *Irwin*, 321 F.3d 637, 639 (7th Cir. 2003).

Taking into account the totality of the circumstances and construing the facts in Hinojosa's favor, there is a triable issue as to whether Contreras used objectively reasonable force. There is no dispute that Contreras received department-wide dispatches stating, among other things, that Kolgovas had previous arrests and a revoked firearm owner's identification card, or that the HBT notified Contreras of the existence of a code-red incident at Kolgovas's apartment complex. And the parties do not dispute that Contreras was told, upon arriving at the scene, that Kolgovas had barricaded himself in his apartment and had threatened to kill the police and himself. With that said, the record does not compel the conclusion that a reasonable officer in Contreras's position would have believed that Kolgovas posed a danger to the officers at the moment Contreras fired his gun. Indeed, Kolgovas's sword was pointed down when he first opened his apartment door, and although Rivlin testified that Kolgovas began to raise his sword as he took a step toward the officers, Rivlin also testified that the sword did not rise more than ninety degrees from the floor. Thus, it is not undisputed, as defendants claim, that Kolgovas threatened the officers with a weapon in the moments immediately preceding the shooting. *Cf. Muhammed* v. *City of Chi.*, 316 F.3d 680, 683 (7th Cir. 2002) (finding that an officer was justified in using deadly force when it was undisputed that the decedent threatened the officers with a gun). Further, the jury must consider other evidence in the record, such as the extent to which Rivlin exposed himself to harm in reaching around the shield, and Contreras's belief that

Rivlin's ballistic shield would not protect Rivlin against sharp-edged weapons like Kolgovas's sword. These facts bear directly on the reasonableness of Contreras's use of force.

The parties also dispute whether Contreras shot his gun at the same time Rivlin deployed the taser or after, and a jury will need to resolve that issue at trial based on the credibility of witnesses. If the jury determines that Contreras's weapon and Rivlin's taser were fired simultaneously, it could reasonably conclude that a prudent officer would have waited to see what impact the taser had before employing deadly force. Indeed, given that Contreras knew that the plan was to tase Kolgovas, common sense suggests that Contreras should have waited until that plan failed before firing his weapon. In addition, it is unclear whether Kolgovas was tased. As discussed above, Filkin identified marks in Kolgovas's skin but was unable to determine whether they were caused by the taser. He also testified that the concentric nature of Kolgovas's bullet wound could be explained if Kolgovas fell forward after being hit by the taser or if he lunged at the officers. A jury finding that Kolgovas was in fact tased, and that his forward movement was merely an involuntary reaction to Rivlin's taser shock (rather than an act of aggression), could reasonably conclude that an officer in Contreras's position would not have fired his weapon. Because the circumstances surrounding Contreras's use of force are unclear and are "susceptible of different interpretations," summary judgment must be denied. *Compare Cyrus* v. *Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (denying summary judgment in excessive force case involving a taser when the jury's resolution of factual issues would enable it to reasonably conclude that the officer's use of force was excessive under the circumstances), *with DeLuna*, 447 F.3d at 1012–13 (granting summary judgment in excessive force case when undisputed facts established that the decedent advanced at the officer for forty to fifty feet and lunged at him before the officer fired his weapon).

11

B.     **Failure-to-Train Claim Against the Sheriff**

Count VII also contains a failure-to-train claim against the Sheriff under 42 U.S.C. § 1983.  Specifically, Hinojosa alleges that the Sheriff "failed to instruct, supervise, control and discipline on a continuing basis . . . Contreras in his duties to refrain from unlawfully and maliciously shooting a citizen who was acting in accordance with his constitutional and statutory rights . . . [and] to refrain from using unreasonable and excessive force and from using deadly force when non-lethal methods of control were being attempted." (Compl. at 9 ¶ 9.)  In her response brief, Hinojosa elaborates that the Sheriff "provided no training . . . as to when to use or not use deadly force when a [t]aser is also involved" and provided "no training to its officers on use of deadly force against people who are intoxicated or have a temporary mental incapacitation." (Dkt. 35 at 13.)  Finally, Hinojosa contends that the Sheriff failed to provide training "regarding edged weapons and their effect on [b]allistic [s]hields." (*Id.*)

A municipality may not be held vicariously liable under the doctrine of *respondeat superior* in a § 1983 suit.  Instead, municipal liability is limited to cases in which constitutional violations are caused by the municipality itself through its own policies, customs, or practices. *Monell* v. *Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  For liability to attach, the municipal policy, custom, or practice must be "the moving force behind the deprivation of constitutional rights." *Wilson* v. *Cook Cnty.*, 742 F.3d 775, 779 (7th Cir. 2014) (quoting *Teesdale* v. *City of Chi.*, 690 F.3d 829, 833 (7th Cir. 2012)).

Under "limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick* v. *Thompson*, 563 U.S. 51, --- , 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011).  Municipal culpability for a deprivation of rights,

however, "is at its most tenuous where a claim turns on a failure to train." *Id.* As such, "[a] municipality will be held liable for the violation of an individual's constitutional rights for failure to train adequately its officers only when the inadequacy in training amounts to *deliberate indifference* to the rights of the individuals with whom the officers come into contact." *Jenkins* v. *Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (emphasis added) (citation omitted). This is a stringent standard, "requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 131 S. Ct. at 1360 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla.* v. *Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)).

Ordinarily, a plaintiff must show a pattern of similar constitutional violations by untrained employees to demonstrate deliberate indifference for purposes of failure to train. *See id.* In this case, Hinojosa has not identified a string of similar incidents that resulted in constitutional violations. Thus, Hinojosa must resort to a single-incident-liability theory to survive summary judgment on her failure-to-train claim. That approach finds its origin in *City of Canton, Ohio* v. *Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989), where the Court left open the possibility that a pattern of similar violations might not be necessary to show deliberate indifference. As recounted by the Court in *Connick*, the *Canton* "Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force." *Connick*, 131 S. Ct. at 1361 (citing *Canton*, 489 U.S. at 390 n.10). "Given the known frequency with which police attempt to arrest fleeing felons and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the Court explained, "a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to

13

the highly predictable consequence, namely, violations of constitutional rights." *Id.* (internal quotation marks omitted) (citations omitted); *see also Jenkins*, 487 F.3d at 492 (recognizing that a municipality may be deemed to have acted with deliberate indifference "when, in light of the duties assigned to specific officers . . the need for more or different training is so obvious . . . that the deficiency exhibits deliberate indifference on the part of municipal policymakers" (citation omitted) (internal quotation marks omitted)).

Hinojosa's case does not fall within this narrow exception. Hinojosa does not dispute that Contreras received substantial training and instead contends that Contreras should have received additional training on when to use deadly force against intoxicated individuals or when a taser is involved, as well as training on a ballistic shield's resistance to sharp-edged weapons. (Dkt. 35 at 13.) In support, she cites the deposition testimony of CCSPD sergeant O'Brien, who testified that he could not recall whether any courses have been offered regarding "what happens when someone is" tased, or "what will happen if an edged weapon strikes a ballistic shield." (Pl.'s L.R. 56.1 ¶ 100.) Hinojosa also points to the testimony of CCSPD sergeant Hartsfield, who testified that he has never trained officers "with regard to situations involving stairways and [the] firing of a [t]aser followed by the use of deadly force." (*Id.* ¶ 105.) As the Court explained in *Connick*, however, "[t]hat sort of nuance simply cannot support an inference of deliberate indifference." *Connick*, 131 S. Ct. at 1363. Indeed, "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton*, 489 U.S. at 392; *see also Palmquist* v. *Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997) ("The estate's argument boils down to 'no special training = deficient training.' We cannot accept this equation."). As such, Hinojosa cannot simply argue that the Sheriff should have done more, but

14

must provide some basis for concluding that the Sheriff was on notice of likely constitutional violations and nevertheless chose, through inaction, to disregard highly predictable consequences and to violate the Constitution. That, Hinojosa has not done. Because this case is readily distinguishable from the extreme circumstances of the hypothetical posed in *City of Canton*, no reasonable jury could conclude from the evidence presented that the Sheriff had notice that a deficiency in its training program would obviously cause its personnel to violate citizens' rights. Summary judgment will be granted on Hinojosa's failure-to-train claim.

**II.     State-Law Claims**

Defendants argue that summary judgment is appropriate on Hinojosa's state-law claims because they are barred by the Illinois Local Governmental and Governmental Employees Tort Immunity Act. The Act governs whether and in what situations local governmental units and their employees are immune from civil liability. *See Harinek* v. *161 N. Clark St. Ltd. P'Ship*, 692 N.E.2d 1177, 1180, 181 Ill. 2d 335, 230 Ill. Dec. 11 (1998). Because the Act is in derogation of the common law, it must be strictly construed against the public entities and employees involved. *See Van Meter* v. *Darien Park Dist.*, 799 N.E.2d 273, 279, 207 Ill. 2d 359, 278 Ill. Dec. 555 (2003). Thus, "[u]nless an immunity provision applies, municipalities are liable in tort to the same extent as private parties." *Id.*

Counts I, II, and III of the second amended complaint bring claims for wrongful death, survival, and funeral expenses, respectively, against all defendants. As Hinojosa explains in her response brief, those counts allege that Contreras committed willful and wanton conduct in shooting Kolgovas and seek to hold the Sheriff vicariously liable for Kolgovas's actions under the doctrine of *respondeat superior*. (*See* dkt. 35 at 15.)

Defendants contend that counts I through III fail because there is no evidence that Contreras acted willfully and wantonly. Under 745 Ill. Comp. Stat. 10/2-202, "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." Willful and wanton conduct is "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 Ill. Comp. Stat. 10/1-210. Whether conduct is willful and wanton is ordinarily a question of fact for the jury but may be determined at summary judgment "if the evidence so overwhelmingly favors one party that a contrary determination cannot stand." *Bielema ex rel. Bielema* v. *River Bend Cmty. Sch. Dist. No. 2*, 990 N.E.2d 1287, 1289, 2013 IL App (3d) 120808, 371 Ill. Dec. 909 (2013) (quoting *Brown* v. *Chi. Park Dist.*, 581 N.E.2d 355, 358, 220 Ill. App. 3d 940, 163 Ill. Dec. 404 (1991)).

Here, for the reasons discussed in connection with Hinojosa's claim for excessive force against Contreras, issues of fact remain as to whether Contreras acted willfully and wantonly in using deadly force. For example, it is unclear whether Contreras fired his weapon at the same time Rivlin deployed the taser or after, and whether Kolgovas was shocked by the taser. Depending on its resolution of these factual issues at trial, a reasonable jury could find, at a minimum, that Contreras exhibited an utter indifference to, or conscious disregard for, Kolgovas's safety. *See Pantaleo* v. *Hayes*, No. 08 C 6419, 2013 WL 5311450, at *17 (N.D. Ill. Sept. 20, 2013) (finding that under the plaintiff's version of the events, the defendant officers could be found at trial to have engaged in willful and wanton conduct).

That leaves counts IV, V, and VI, which allege that the Sheriff negligently failed to train Contreras and other officers in various respects and "[a]llowed . . . Contreras to be assigned to

16

use lethal force in situations which involved use of a [t]aser without his having sufficient knowledge."[5] (Compl. at 6 ¶ 11.) Defendants argue that these counts are barred by 745 Ill. Comp. Stat. 10/2-201, which states that "[e]xcept as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." Hinojosa counters that this section does not bar her claims, because her allegations against the Sheriff do not involve the exercise of discretion or the determination of policy.

The court need not resolve that dispute as defendants have failed to carry their burden to show that 745 Ill. Comp. Stat. 10/2-201 defeats Hinojosa's claims. *See Celotex*, 477 U.S. at 323 (noting that the party moving for summary judgment bears the initial burden of showing there is no genuine issue of material fact); *Van Meter*, 799 N.E.2d at 280 ("Because the immunities afforded to governmental entities operate as an affirmative defense, those entities bear the burden of properly raising and proving their immunity under the Act."). By its plain terms, the cited section of the Tort Immunity Act applies only to "public employees," which the Act defines as "employee[s] of a local public entity."[6] 745 Ill. Comp. Stat. 10/1-207. The Sheriff, however, sued here in his official capacity as an institutional defendant, "is not an employee of the county

---

[5] Counts IV, V, and VI are essentially identical, except for the injuries allegedly incurred. Count IV alleges that the Sheriff failed to adequately train Contreras and asserts that, as a result, Kolgovas's "next-of-kin have sustained loss of society, pecuniary loss, and damages for grief, sorrow and mental suffering." (Compl. at 6 ¶ 16.) Count V incorporates the allegations of count IV by reference, and alleges that the Sheriff's negligence caused Kolgovas to be "injured and incapacitated, incur[] medical and hospital expenses . . . [and] experience[] pain and suffering, loss of a normal life, and disfigurement." (*Id.* at 7, count V ¶ 15.) Similarly, count VI seeks to recover the funeral expenses incurred as a result of the Sheriff's conduct. (*Id.* at 7, count VI ¶ 15.)

[6] In turn, the Act defines "employee" to "include[] a present or former officer, member of a board, commission or committee, agent, volunteer, servant or employee, whether or not compensated, but . . . not includ[ing] an independent contractor." 745 Ill. Comp. Stat. 10/1-202.

17

in which [he] serves," and instead is an independently elected county officer and a "local public entity" within the meaning of the statute. *Carver* v. *Sheriff of LaSalle Cnty.*, 787 N.E.2d 127, 136–38, 203 Ill. 2d 497, 272 Ill. Dec. 312 (2003). While some sections of the Tort Immunity Act apply to both public employees and local public entities, *see, e.g.*, 745 Ill. Comp. Stat. 10/4-102, section 2-201 does not. Defendants have not cited any authority for applying section 2-201 to this context, and instead simply state, in a perfunctory manner, that the Sheriff "is a public employee serving in a position involving the determination of policy or the exercise of discretion." (Dkt. 27 at 15.) Absent additional support for defendants' argument, the Tort Immunity Act does not serve as a basis for granting summary judgment on Hinojosa's claims. *See Jacoby* v. *DuPage Cnty. Ill.*, No. 12 C 6539, 2013 WL 3233339, at *4 (N.D. Ill. June 26, 2013) (finding that 745 Ill. Comp. Stat. 10/2-204 did not apply to the Sheriff of DuPage County because the plain language of that section applies only to public employees, not local public entities); *Thomas ex rel. Smith* v. *Cook Cnty. Sheriff*, 401 F. Supp. 2d 867, 875 (N.D. Ill. 2005) (same with respect to the Sheriff of Cook County).

## CONCLUSION AND ORDER

For the foregoing reasons, defendants' motion for summary judgment (dkt. 25) is granted in part and denied in part. The motion is granted with respect to Hinojosa's failure-to-train claim against the Sheriff but is otherwise denied. The case is set for status on September 29 at 11:00 AM to set a trial date. The parties are encouraged to explore potential settlement and to advise the court if referral to a Magistrate Judge for a settlement conference would be useful.

Date: September 10, 2015

_____
U.S. District Judge Joan H. Lefkow